**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| In re Shell Eggs Antitrust Litigation<br>This Document Relates to:<br>ALL ACTIONS | Case No. 3:26-md-3175-jdp<br>MDL No. 3175<br>Chief Judge James D. Peterson |

# CERTAIN DEFENDANTS'[1] MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS

1 Certain Defendants includes all Defendants identified in the Direct Purchaser, Commercial Indirect Purchaser, and Consumer Indirect Purchaser Plaintiffs' amended consolidated class action complaints (collectively, the "Complaints"), other than Urner Barry.

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 4

A. Shell Eggs in the United States ..... 4

B. The Parties ..... 5

C. How Eggs Are Bought and Sold ..... 8

1. Producing Eggs ..... 8

2. Buying Eggs and ECI ..... 9

3. Selling Eggs and Urner Barry ..... 9

D. HPAI and Its Impact on Eggs ..... 10

E. Plaintiffs' Conspiracy Allegations ..... 12

F. Plaintiffs' Claims ..... 14

LEGAL STANDARD ..... 14

ARGUMENT ..... 15

I. COUNT I SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO ALLEGE ANY Plausible CONSPIRACY ..... 15

A. The Complaints Fail to Allege Any Direct Evidence of an Agreement. ..... 16

B. Plaintiffs Fail to Allege Any Circumstantial Evidence of an Agreement. ..... 19

1. Plaintiffs' Alleged Conspiracy Is Facially Implausible. ..... 20

2. Plaintiffs Fail to Allege Parallel Conduct. ..... 26

3. Plaintiffs' Alleged "Plus Factors" Do Not Support the Inference of a Conspiracy. ..... 32

II. INDIRECT PURCHASER PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED ..... 39

A. All State-Law Claims Fail Without a Plausible Federal Antitrust Claim. ..... 39

B. IPPs' State-Law Claims Also Fail for Independent, State-Specific Reasons. ..... 40

1. Consumer Protection Laws of Certain States Do Not Apply to Antitrust-Type Conduct. 40

2. IPPs Fail to Satisfy Pre-Complaint Notice Requirements of Several States. ..... 40

3. Certain State Laws Bar IPPs from Pursuing Class Actions. ..... 41

4. Certain Consumer Protection Statutes Do Not Allow Claims Based on Commercial Transactions. ..... 42

5. Certain Consumer Protection Statutes Prohibit Recovery of Damages. ..... 42

6. IPPs Do Not Meet the Pleading Standards of the Florida and Michigan Statutes. ..... 43

7. *Illinois Brick* Bars IPPs' Antitrust Claims at Least in Part in Certain States. ..... 43

C. Commercial IPPs' Unjust Enrichment Claims Fail as a Matter of State Law. ..... 44

1. Commercial IPPs Fail to Plead an Unjust Enrichment Claim Under Any State's Law. 44

2. Unjust Enrichment Is Not a Standalone Basis for Relief in Certain States. ................ 45

3. Some States Bar Commercial IPPs' Unjust Enrichment Claims Where an Adequate Legal Remedy Exists. ........................................................................................... 46

4. Commercial IPPs' Unjust Enrichment Claims Also Fail to Meet Pleading Standards in Specific States. ............................................................................................. 46

CONCLUSION ............................................................................................................ 47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alarm Detection Sys., Inc. v. Vill. of Schaumburg*,
930 F.3d 812 (7th Cir. 2019) ....................14, 24

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016)....................39

*Always Towing & Recovery, Inc. v. City of Milwaukee*,
2 F.4th 695 (7th Cir. 2021) ....................14

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
367 F.3d 212 (4th Cir. 2004) ....................16

*Am. Dental Ass'n v. Cigna Corp.*,
605 F.3d 1283 (11th Cir. 2010) ....................36

*Amory Invs. LLC v. Utrecht-Am. Holdings, Inc.*,
74 F.4th 525 (7th Cir. 2023) ....................22, 23, 33

*In re Asacol Antitrust Litig.*,
2016 WL 4083333 (D. Mass. July 20, 2016)....................40

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................14, 15

*Ass'n Benefit Servs. v. Caremark Rx, Inc.*,
493 F.3d 841 (7th Cir. 2007) ....................44

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
2020 WL 5642941 (N.D. Ill. Sept. 22, 2020), *aff'd,* 15 F.4th 831 (7th Cir. 2021) ....................21

*Bank of Am., N.A. v. Knight*,
725 F.3d 815 (7th Cir. 2013) ....................20, 27

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).................... *passim*

*In re Broiler Chicken Antitrust Litig.*,
2022 WL 1262084 (N.D. Ill. Feb. 11, 2022), *aff'd sub nom. Amory*, 74 F.4th 525....................22, 33

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ....................24

*In re Broiler Chicken Antitrust Litig.*,
702 F. Supp. 3d 635 (N.D. Ill. 2023) ....................34

*In re Cattle & Beef Antitrust Litig.*,
No. 0:22-md-3031 (D. Minn. Jan. 30, 2023) ....................35

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
92 F.4th 381 (2d Cir. 2024) ....................28, 31

*Cleary v. Philip Morris Inc.*,
656 F.3d 511 (7th Cir. 2011) ....................45

*Cole v. Chevron USA, Inc.*,
554 F. Supp. 2d 655 (S.D. Miss. 2007)....................46

*In re Concrete & Cement Additives Antitrust Litig.*,
2025 WL 1755193 (S.D.N.Y. June 25, 2025) ....................29

*Contractor Util. Sales Co. v. Certain-teed Prods. Corp.*,
638 F.2d 1061 (7th Cir. 1981) ....................16

*Cosmetic Gallery, Inc. v. Schoeneman Corp.*,
495 F.3d 46 (3d Cir. 2007)....................16

*In re Crop Inputs Antitrust Litig.*,
172 F.4th 570 (8th Cir. 2026) ....................19, 26, 29

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*,
60 F. Supp. 3d 914 (N.D. Ill. 2014) ....................18

*Dennis Simmons, D.D.S., P.A. v. Mod. Aero, Inc.*,
603 N.W.2d 336 (Minn. Ct. App. 1999)....................42

*Dooner v. Yuen*,
2016 WL 6080814 (D. Minn. Oct. 17, 2016) ....................46

*Dorrell v. Constellation Energy Corp.*,
2026 WL 2249275 (D. Md. Aug. 5, 2026) ....................28, 29, 30

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007) ....................41

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)....................38

*Erie Cnty., Ohio v. Morton Salt, Inc.*,
702 F.3d 860 (6th Cir. 2012) ....................31, 36

*Ewald Bros., Inc. v. Mid-Am. Dairymen, Inc.*,
877 F.2d 1384 (8th Cir. 1989) ....................6

*Gen. Insulation Co. v. Eckman Const.*,
992 A.2d 613 (N.H. 2010) ....................46

*Gibson v. Cendyn Grp., LLC*,
148 F.4th 1069 (9th Cir. 2025) ....................34

*In re GSE Bonds Antitrust Litig.*,
396 F. Supp. 3d 354 (S.D.N.Y. 2019)....................31

*Hill v. Roll Int'l Corp.*,
128 Cal. Rptr. 3d 109 (Cal. Ct. App. 2011) ....................45

*In re Humira (Adalimumab) Antitrust Litig.*,
465 F. Supp. 3d 811 (N.D. Ill. 2020) ....................39

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)....................20, 36

*JSW Steel (USA) Inc. v. Nucor Corp.*,
586 F. Supp. 3d 585 (S.D. Tex. 2022) ....................33, 34

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
910 F.3d 927 (7th Cir. 2018) ....................35, 36

*Korea Supply Co. v. Lockheed Martin Corp.*,
63 P.3d 937 (Cal. 2003) ....................42

*U.S. ex rel. Lacy v. New Horizons, Inc.*,
348 F. App'x 421 (10th Cir. 2009) ....................43

*Loren Data Corp. v. GXS, Inc.*,
501 F. App'x 275 (4th Cir. 2012) ....................19

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
29 F.4th 337 (7th Cir. 2022) ....................15, 19

*Martis v. Grinnell Mut. Reins. Co.*,
905 N.E.2d 920 (Ill. App. Ct. 2009) ....................47

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)....................16

*In re Mexican Gov't Bonds Antitrust Litig.*,
412 F. Supp. 3d 380 (S.D.N.Y. 2019)....................32

*In re Microsoft Corp. Antitrust Litig.*,
401 F. Supp. 2d 461 (D. Md. 2005) ....................47

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) ....................19

*Mountain Crest SRL, LLC v. Anheuser-Busch InBev SA/NV*,
456 F. Supp. 3d 1059 (W.D. Wis. 2020) ....................14, 20

*Mulligan v. QVC, Inc.*,
888 N.E.2d 1190 (Ill. App. Ct. 2008) ....................45

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ....................29, 36

*In re Myford Touch Consumer Litig.*,
2016 WL 7734558 (N.D. Cal. Sept. 14, 2016) ....................42

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) ....................45

*Oklahoma Firefighters Pension & Ret. Sys. v. Deutsche Bank Aktiengesellschaft*,
2024 WL 4202680 (S.D.N.Y. Sept. 13, 2024) ....................28

*In re Opana ER Antitrust Litig.*,
162 F. Supp. 3d 704 (N.D. Ill. 2016) ....................41, 43, 45

*In re Packaged Ice Antitrust Litig.*,
779 F. Supp. 2d 642 (E.D. Mich. 2011) ....................43, 45

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
911 F.3d 505 (8th Cir. 2018) ....................26, 32

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
767 F. Supp. 3d 681 (N.D. Ohio 2025) ....................30, 34, 37

*Perdue Farms, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
517 F. Supp. 3d 458 (D. Md. 2021) ....................34

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
631 F.3d 436 (7th Cir. 2011) ....................43

*In re Pork Antitrust Litig.*,
2019 WL 3752497 (D. Minn. Aug. 8, 2019) ....................21, 31, 32

*In re Pork Antitrust Litig.*,
No. 0:18-cv-01776 (D. Minn. June 28, 2018) ....................35

*In re Processed Egg Prods. Antitrust Litig.*,
850 F. App'x 142 (3d Cir. 2021) ....................38

*In re Processed Egg Prods. Antitrust Litig.*,
962 F.3d 719 (3d Cir. 2020)....................38

*In re PVC Antitrust Litig.*,
2026 WL 2943355 (N.D. Ill. Sept. 30, 2026) ....................25, 37

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
587 F. Supp. 2d 27 (D.D.C. 2008) ....................22

*Rozema v. Marshfield Clinic*,
977 F. Supp. 1362 (W.D. Wis. 1997) ....................38

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
870 F.2d 397 (7th Cir. 1989) ....................34

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ....................27

*Segal v. Amadeus IT Group, S.A.*,
2026 2026 WL 879583 (N.D. Ill. Mar. 31, 2026)....................34

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ....................15, 16

*Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc.*,
628 N.W.2d 707 (N.D. 2001) ....................42, 43

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) ....................36

*Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*,
497 F.2d 203 (9th Cir. 1974) ....................6

*In re Treasury Sec. Auction Antitrust Litig.*,
595 F. Supp. 3d 22 ....................17, 28

*United States v. Cal-Maine Foods, Inc. et al.*,
5:26-cv-04060-LTS-MAR (N.D. Iowa)....................14

*VCS, Inc. v. Utah Cmty. Bank*,
293 P.3d 290 (Utah 2012)....................46

*Ventura v. Kyle*,
825 F.3d 876 (8th Cir. 2016) ....................46

*Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
2020 WL 1666454 (N.D. Ill. Apr. 3, 2020) ........................................................ 14, 20

*Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
328 F. Supp. 3d 824 (N.D. Ill. 2018) ........................................................................ 36

*White v. R.M. Packer Co.*,
635 F.3d 571 (1st Cir. 2011) ..................................................................................... 35

## **INTRODUCTION**

Plaintiffs' Complaints are long on pages and short on the facts necessary to support their claims. They allege that sixteen egg producers, ranging from the nation's largest producers to small regional farms; an egg producer cooperative that operates only in the western United States; Urner Barry, a price-reporting agency; and ECI, a spot-market egg exchange, all agreed to inflate the prices of more than sixty distinct egg products, across six regional markets, and to keep them there for years.

But Plaintiffs plead no facts that make this sprawling, multi-faceted conspiracy among these Defendants, who have fundamentally different businesses and different incentives, plausible. For most egg producers, the Complaints offer only a single, nearly verbatim sentence stating that the Defendant "subscribed to Urner Barry [price reporting], its Commodity Shell Egg prices were tied to Urner Barry benchmarks, and it participated in the conspiracy." But subscribing to Urner Barry, a service equally available to Plaintiffs and Defendants, and unilaterally setting egg prices relative to Urner Barry quotations describe how egg producers *and their customers* do business every day. It cannot suffice to state a claim here.

More fundamentally, despite having access to a DOJ complaint and Urner Barry documents, Plaintiffs do not allege a single communication showing that any of the nineteen Defendant families—much less all of them—agreed to fix prices, manipulate Urner Barry's quotations, or restrict supply. The few communications between Defendants that are referenced in Plaintiffs' Complaints involve only ***four*** Defendants. And all four Defendants were, at the time of those communications, members of the same lawful cooperative. It is unsurprising—and certainly not indicative of conspiracy—for members of a cooperative, whose purpose is to sell the collective membership's eggs, to be discussing the sourcing and sale of eggs.

To fill the gaps, Plaintiffs allege that certain Defendants bought eggs from other Defendants at prices higher than Urner Barry's quotations during the alleged conspiracy period. But Plaintiffs' own allegations establish why that makes business sense. Some producers do not produce enough eggs to satisfy their total customer needs (they are "net short"), so they buy eggs from other producers when needed to meet varying customer demand. And when an historic avian flu outbreak—which, by Plaintiffs' own account, struck at the very start of the alleged conspiracy period—destroyed tens of millions of hens, those producers had to compete for scarce supply. The result is economics 101. When supply is short and a producer needs to fill a customer's order, it must buy eggs at prevailing spot market prices. Otherwise, the producer risks losing that customer's business. Such a market-clearing trade often prices above the last transaction. Plaintiffs call these spot market trades on an exchange platform "premium" and "inflated" relative to Urner Barry quotations, then ask the Court to infer from those transactions a single scheme spanning nineteen Defendant families, dozens of products, six regions, and several years. The inference does not follow. The fact that certain transactions may have exceeded a trailing benchmark published by Urner Barry—which Plaintiffs concede is based on the subjective judgment of Urner Barry analysts—is unremarkable.

Plaintiffs then allege that it was conspiratorial for Defendants to report those transactions to Urner Barry. But Urner Barry affirmatively gathers market information from buyers and sellers alike to inform its market analysis. The fact that egg producers reported completed transactions so that Urner Barry could use those data points as one of many factors for developing its own, independently determined quotations is not evidence of a conspiracy; it is the ordinary course of business. And Plaintiffs allege that Urner Barry repeatedly *resisted* producers' individual calls for higher quotations.

Plaintiffs' Complaints also feint in the direction of a supply reduction conspiracy. Their only basis is that the nationwide aggregate supply of eggs—produced by Defendants and non-defendants alike—fell during the alleged conspiracy period and was allegedly slow to recover after repeated waves of avian flu. Plaintiffs do not identify a single flock decision by a single Defendant. Courts in this Circuit have held such allegations insufficient to plead a conspiracy, and this Court should do so here as well.

At bottom, the Complaints list companies in the same industry, join them together with the word "Defendants," and assert that prices are too high. The Sherman Act requires more, and the Complaints should be dismissed for the following reasons.

***First***, Plaintiffs allege no direct evidence of the conspiracy they plead. The few communications Plaintiffs try to frame as direct evidence involve only four of the alleged conspirators, and are exactly the communications one would expect among members of an egg producer cooperative, of which those Defendants were a part. They are not direct evidence of an agreement among the small group of cooperative members, much less among the industry-wide conspiracy Plaintiffs allege in their Complaints.

***Second***, Plaintiffs do not plead circumstantial evidence of the massive conspiracy they allege, either. Indeed, the alleged conspiracy is implausible on its face. Plaintiffs never explain when or how so many disparate companies formed a single scheme, how that scheme could operate across dozens of products and six regions, or how producers could control an independent price-reporting agency that drew information from buyers and sellers alike, especially where Plaintiffs' own allegations establish that Urner Barry ignored and resisted alleged producer pressure to raise its quotations.

Plaintiffs also fail to plead the necessary elements of a circumstantial case: parallel conduct and plus factors. As to parallel conduct, Plaintiffs' benchmark theory rests on anecdotal bidding episodes among a few Defendants and scattered trades between different pairs of producers. That falls far short of showing that all Defendants took action similar in substance, timing, and effect. Similarly, their supply theory alleges no actual flock decisions by any Defendant, much less parallel decisions. Plaintiffs' sole reliance on national data is no substitute for those critical allegations. Plaintiffs plead no plus factors either. They point instead to attributes of the egg industry, participation in trade associations, irrelevant separate legal proceedings, and actions that were in each Defendant's unilateral interest. Courts regularly find such "plus factors" inadequate, for good reason.

***Third***, the Indirect Purchaser Plaintiffs' state-law claims fall with their federal claims, and they also fail for independent, state-specific reasons.

In the end, the only thing that unites the companies Plaintiffs have sued is the same thing that unites every egg producer in the country: a historic disease that destroyed tens of millions of hens, returned in wave after wave before flocks could recover, and drove up egg prices. Rising prices during a historic disease outbreak are not evidence of an agreement. The Complaints offer nothing more to plausibly tie these Defendants together in a scheme to fix prices, and Plaintiffs' claims should therefore be dismissed.

## BACKGROUND

### A. Shell Eggs in the United States

Eggs are "among the most nutritious foods on earth," and are a staple in most U.S. households, with demand that Plaintiffs allege is "inelastic"—*i.e.*, that "consumers purchase similar quantities regardless of price fluctuations"—and has risen steadily over recent decades.

DPP Compl. ¶¶ 5, 150–51, 349.[2] This case concerns conventional and cage-free shell eggs, which Plaintiffs call "Commodity Shell Eggs" or "Shell Eggs," and describe as "standard white or brown eggs produced in non-specialty systems that comply with applicable hen housing requirements." *Id.* ¶¶ 153, 158. Though perhaps simple in concept, Plaintiffs' definition of "Shell Eggs" in fact sweeps in more than sixty distinct products, distinguished by size (Jumbo, Extra Large, Large, Medium, and Small), grade (Grade B to AA), color (white or brown), and hen housing (conventional or cage-free). *Id.* ¶¶ 153, 158, 161. It excludes "specialty" eggs (organic, free-range, pasture-raised, and nutritionally enhanced), and "egg products"—eggs that are broken and sold in liquid, frozen, or dried form. *Id.* ¶¶ 152, 158, 160.

### B. The Parties

Plaintiffs are purchasers of shell eggs who divide themselves into three putative classes: (1) Direct Purchaser Plaintiffs that purchased eggs directly from "one or more Defendants," without identifying which Defendant(s), DPP Compl. ¶¶ 30–48; (2) Commercial Indirect Purchaser Plaintiffs—restaurants and food-service businesses that purchased eggs indirectly from someone *other* than a Defendant "for [their] own business use in commercial food preparation," Comm. IPP Compl. ¶¶ 30–48; and (3) Consumer Indirect Purchaser Plaintiffs who purchased eggs at retail for personal consumption, Consumer IPP Compl. ¶¶ 30–76.

The Defendants are a disparate group of more than twenty[3] total entities involved at different points in the production and sale of shell eggs:

---

[2] The DPP Complaint states that its factual allegations "are the same as those set forth in the 'Factual Allegations Common to All Classes' section of the Indirect Commercial Purchasers' and Indirect Consumer Purchasers' respective Consolidated Complaints." DPP Compl. at 27 n.3. For ease of reference, Defendants cite primarily to the DPP Complaint.

[3] Plaintiffs' Complaints name twenty-four individual defendants. Defendants refer to the Hillandale entities collectively as "Hillandale," and to Versova Holdings, LLC, Centrum Valley Holdings, LLC, and Versova Management Cooperative collectively as "Versova."

**Egg Producers:** The majority of Defendants are egg farmers ranging from producers with flocks in the tens of millions, to smaller producers with alleged flocks of only two to seven million hens. DPP Compl. ¶¶ 72, 78, 87, 102, 106, 116, 135, 139, 166. By piecing together the sixteen producer Defendants, Plaintiffs allege these Defendants collectively control "approximately 73% of all egg-laying hens." *Id.* ¶¶ 166, 171.

**ProEgg:** One Defendant is an egg producer cooperative through which its members—egg producers—source and distribute eggs in thirteen western states. *Id.* ¶¶ 109–10. Plaintiffs allege ProEgg was founded in late 2022 by eight entities: three Defendants (Cal-Maine, Hickman's, and Opal); two Defendant affiliates (Central Valley Eggs, affiliated with Hickman's, and Willamette Egg Farms, affiliated with Versova); and three entities not alleged to be conspirators, Colorado Egg, LLC, Oakdell Egg Farms, Inc.,[4] and Ritewood, Inc. *Id.* ¶¶ 109, 113. Pursuant to an express statutory exemption to the antitrust laws, such cooperatives may "collectively process and market their products," *Ewald Bros., Inc. v. Mid-Am. Dairymen, Inc.*, 877 F.2d 1384, 1390 (8th Cir. 1989), including collective "buying, selling, storing, standardizing, financing, risk bearing, and supplying market information." *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203, 215 (9th Cir. 1974) (citation modified). Notably, most of the inter-defendant communications Plaintiffs allege to support their conspiracy theory were between and among ProEgg and ProEgg's members at the time—Cal-Maine, Hickman's, and Versova. *See, e.g.*, DPP Compl. ¶ 230 (alleging text message from Cal-Maine executive to Versova executive); ¶ 245 (alleging text message and phone call from Cal-Maine executive to Hickman's executive); ¶ 247 (alleging a weekly call among Cal-Maine, Versova, and Hickman's); ¶ 249 (alleging Hickman's executive's email to and

---

[4] Plaintiffs have named Oakdell Farms, LLC as a Defendant, which did not exist before December 2023, is within the Versova corporate family, and is a different legal entity than Oakdell Egg Farms, Inc. Non-defendant Oakdell Egg Farms, Inc. was a founding member of ProEgg; Defendant Oakdell Farms, LLC was not.

phone calls with Cal-Maine and Versova); ¶ 251 (alleging Hickman's email to Cal-Maine, Versova, and ProEgg); ¶ 252 (alleging emails between ProEgg, Hickman's, Cal-Maine, Versova, "and others"). It is unsurprising—and not indicative of a conspiracy—that members of an egg producer cooperative would be discussing the business of the cooperative, including the sourcing and sale of eggs by that cooperative.

**Urner Barry:** Urner Barry is the price-reporting agency that has published protein market price quotations, including for eggs, "for over a century" using, as Plaintiffs admit, its own "subjective" editorial judgment. *Id.* ¶¶ 129, 201. At most, Plaintiffs allege that Urner Barry invited egg producers, like other market participants, to share their views of market conditions with Urner Barry reporters—consistent with the methodology alleged in the Complaints—and that Urner Barry sometimes considered that information in setting quotations. *Id.* ¶¶ 201, 212, 261. Plaintiffs do not allege that Urner Barry changed its long-standing methodology, reporting practices, or data sources during the alleged conspiracy period; Urner Barry did the same thing before and after the alleged conspiracy began. Nor do Plaintiffs explain why Urner Barry would risk its credibility with other industries to conspire with egg producers; rather, Urner Barry gained nothing from joining the alleged conspiracy.

**Egg Clearinghouse, Inc. ("ECI"):** Plaintiffs also include as a Defendant an organized spot market trading platform where Plaintiffs allege approximately 5% of shell egg transactions occur. *Id.* ¶ 53. Plaintiffs acknowledge that ECI members include both egg sellers and buyers (like Plaintiffs). *Id.* ¶ 66. Founded in 1971, ECI conducts trading through a "blind bid[ding]" process in which participants do not learn each other's identities until after a trade is executed. *Id.* ¶¶ 187, 209. Plaintiffs allege that ECI's current directors include representatives of certain producer Defendants—Cal-Maine, Hillandale, and Versova—and therefore ECI is "controlled" by

Defendants. *Id.* ¶¶ 54, 209. But Plaintiffs allege no change in how ECI operated during the alleged conspiracy period, no ways in which Defendants actually exercised any "control," and no method by which ECI did or could have facilitated a conspiracy among the named Defendants.

Notably, Plaintiffs never explain how or when each and every one of these Defendants allegedly joined together to inflate egg prices.

### C. How Eggs Are Bought and Sold

#### 1. Producing Eggs

Egg production starts with breeder flocks, which lay fertilized eggs that hatch into chicks. DPP Compl. ¶ 154. Plaintiffs allege that producers source their breeder flocks from Rose Acre and Cal-Maine (two of the Defendants here),[5] or from specialized animal genetics companies that are not parties to this action. *Id.* ¶ 170. The female chicks (pullets) grow into layer hens—chickens capable of producing shell eggs at commercial scale. *Id.* ¶ 154.

Plaintiffs allege that layer hens begin producing eggs at 18 to 22 weeks of age and reach peak production at 30 to 32 weeks. *Id.* ¶ 155. In other words, based on Plaintiffs' allegations, it takes about seven months for a flock to reach the point where 90% of hens lay eggs on any given day. *Id.* Plaintiffs allege that by 60 to 70 weeks—slightly over a year—a flock's productivity drops to 50%. *Id.* Plaintiffs allege producers can extend a flock's productive life through molting, which temporarily halts egg production. *Id.* ¶ 156. Even with molting, most layer hens are ultimately culled—that is, permanently removed from the flock and replaced with younger hens—after 100 to 130 weeks. *Id.* ¶ 155.

---

[5] Plaintiffs do not allege any actual purchases of pullets by any Defendant from Cal-Maine or Rose Acre, and for good reason—Cal-Maine and Rose Acre do not sell pullets to other producers.

### 2. Buying Eggs and ECI

As Plaintiffs explain, some producers operate a "net short" business strategy: they produce fewer eggs than they may need and then buy eggs to meet their contractual commitments, because the exact volume demanded by customer needs fluctuates and eggs are a perishable product. *Id.* ¶ 195. Plaintiffs allege that producers buy many of these eggs on the ECI spot market trading platform. *Id.* ¶ 187. And because net-short producers must buy from whoever has eggs to sell, they routinely buy eggs from other producers—including other Defendants—whether on ECI or through direct, off-exchange transactions.[6] *Id.* ¶¶ 189, 195.

### 3. Selling Eggs and Urner Barry

Plaintiffs allege that most shell eggs are sold through private contracts between producers and buyers (retailers, food service operators, distributors, traders, etc.) using prices set by reference to Urner Barry's daily wholesale quotations. *Id.* ¶ 179. Plaintiffs do not allege that the Defendant egg producers insisted on this arrangement, but rather that egg *purchasers* do, as they [redacted] *Id.*

Urner Barry has published egg price quotations for over a century. *Id.* ¶ 177. To do so, its reporters [redacted] through communications [redacted] *Id.* ¶¶ 183–84 (emphasis added). Plaintiffs allege that, like any reputable commodity reporting agency, Urner Barry [redacted]. *Id.* Plaintiffs further allege that Urner Barry's methodology prioritizes, in order of importance: [redacted]

[6] Plaintiffs repeatedly call such transactions "trades." *See, e.g.*, DPP Compl. ¶¶ 189, 195. In the egg industry, a "trade" is simply a purchase and sale of eggs.

[redacted] *See id.* Urner Barry analyzes, aggregates, and anonymizes the information it receives, applies its "subjective judgment," and publishes daily price quotations for six regions: Northeast, Southeast, Midwest, Northwest, California, and South Central. *Id.* ¶¶ 181, 201–02, 204.

Plaintiffs make much of the egg producer Defendants' alleged influence over Urner Barry. At the same time, the Complaints acknowledge that Urner Barry's "subjective judgment," *id.* ¶ 201, guards ***against*** producer control of Urner Barry's quotations, and that during the relevant period, Urner Barry employees ***resisted*** producer pressure, with employees [redacted] *Id.* ¶¶ 266, 275 (emphasis added).

### D. HPAI and Its Impact on Eggs

In February 2022, the buying and selling of eggs was severely disrupted because of an avian flu ("HPAI") outbreak. *See, e.g.*, DPP Compl. at 79, fig. 10; *id.* ¶¶ 282, 298. Plaintiffs acknowledge the H5N1 strain of HPAI was first detected in wild birds in early 2022—nearly the exact moment Plaintiffs claim the alleged conspiracy began. *Id.* ¶ 282.

The toll has been severe. According to Plaintiffs' own data, the alleged flock reduction during the alleged class period totaled approximately 43.3 million hens. *Id.* ¶ 298. And Plaintiffs acknowledge that, years later, the national laying flock still "has not yet recovered to its pre-outbreak size of roughly 330 million hens," fluctuating between 295 and 320 million from 2023 through 2025—as many as 35 million hens below its pre-outbreak level. *Id.* ¶¶ 290, 312. This was not the U.S. egg industry's first run-in with HPAI. A six-month outbreak struck in 2014–2015, from which the industry took eight months to recover. *Id.* ¶ 288; *id.* at 79, fig. 10. But this outbreak has been different; rather than one six-month outbreak, the industry has weathered

repeated waves of HPAI over the course of several years. *Id.* at 79, fig. 10. Although the egg production cycle may normally be "stable and predictable," disease outbreaks are not—they result in immediate reductions in both birds and eggs. *Id.* ¶ 155.

Plaintiffs' Complaints concede HPAI's dramatic impact on commercial flocks. Based on Plaintiffs' description of the egg production cycle, *see supra* Background § C.1, once HPAI destroys a flock, it takes roughly seven to eight months for replacement hens to reach full production—assuming pullets (young hens raised on separate farms until laying age, which are also susceptible to HPAI) are even available. DPP Compl. ¶¶ 154–55. A single outbreak, even if immediately contained, can suppress production for well over six months. *Id.* ¶ 155 (fewer egg-laying hens "predictably shrinks supply six to eight months later"). When new outbreaks occur before replacement flocks reach full production—as they did here—the supply deficit compounds. *Id.* at 79, figs. 10 & 12. At the same time, the costs to replenish and maintain flocks rose. As Plaintiffs acknowledge, from 2021 to 2022 alone, Cal-Maine reported that production and feed costs rose 22%, while processing costs increased 20%. *Id.* ¶ 315.

Plaintiffs also allege a bottleneck in replenishing flocks. Most independent producers do not maintain their own breeder flocks; as Plaintiffs allege, "[i]ndependent producers without breeder flocks must source replacement pullets." *Id.* ¶ 170. And Plaintiffs allege that, although breeders were "producing more fertilized eggs" than before 2022, "20 million fewer pullets" were placed than in prior years. *Id.* ¶ 293. But those pullets, too, were susceptible to HPAI.

Plaintiffs allege that the average flock size declined only modestly—3.82% in 2022, 3.16% in 2023, and 5.18% in 2024—and that the monthly flock in 2022 "never fell more than 6.7% from its five-year average." *Id.* ¶¶ 283, 306. But Plaintiffs also acknowledge that eggs are "one of the most popular foods in America," with "highly inelastic" demand, *id.* ¶ 5, meaning that even small

supply reductions can produce large price increases. And annual averages mask the volatility: each wave destroyed millions of hens, and the next wave often struck while flocks were still being rebuilt, so each decline did not start from the same baseline. *See id.* at 79, figs. 10 & 12. Nor do mere averages capture the demand-side shocks that hit while supply was constrained. Plaintiffs' allegations about reports to Urner Barry during the same period point, if anything, to surging holiday-season demand, *see, e.g.*, *id.* ¶¶ 247–50, 257–60 (quoting [redacted]); weather disruptions, *id.* ¶ 240 (quoting [redacted]); and panic buying, *id.* ¶¶ 273, 310 (describing [redacted]). Each of these pressures strained supply at various times, on top of the losses from HPAI. When egg producers are scrambling to meet that volatile demand amid successive waves of avian flu, they "keep bidding until they get those eggs" to keep their customers. *Id.* ¶ 350. Demand spikes layered on top of repeated supply losses are precisely what one would expect to produce the volatile prices that Plaintiffs attribute to conspiracy.

Notably, while Plaintiffs allege that "Defendants collectively slowed" flock recovery, *id.* ¶ 15, the Complaints do not identify any specific supply-restriction action taken by any specific Defendant. Instead, they rely entirely on industry-wide USDA statistics regarding the aggregate size of the national laying flock. *Id.* ¶¶ 175, 283, 304, 306. These statistics provide no insight into the cause of the fluctuation, and therefore cannot establish that any egg producer, much less all of them, actually intended to decrease their flock size.

**E. Plaintiffs' Conspiracy Allegations**

Plaintiffs allege that beginning "no later than January 2022," Defendants conspired to inflate shell egg prices nationwide. DPP Compl. ¶ 9. Their alleged conspiracy has four prongs:

***First***, Plaintiffs allege that Defendants coordinated bidding on ECI, submitting "artificially high bids" and "coordinat[ing] the timing and volume of the bids they placed on ECI" to influence the Urner Barry quotation. *Id.* ¶¶ 11, 244.

***Second***, Plaintiffs allege that Defendants executed producer-to-producer trades at "inflated" prices—which Plaintiffs appear to define as anything above the Urner Barry quotation at the time—and reported them to Urner Barry "to giv[e] Urner Barry's reporters completed transactions to point to in justifying a higher quotation." *Id.* ¶ 214.

***Third***, Plaintiffs allege that Defendants communicated directly with Urner Barry reporters—by phone, email, and voicemail—to shape the "market 'assessments'" that Urner Barry considers in setting its daily spot quotation, such as reports that [redacted] *Id.* ¶¶ 201, 259, 261.

***Fourth***, Plaintiffs allege that Defendants "manufactured … just enough of that scarcity [] to keep prices from collapsing" by "collectively slow[ing]" flock recovery after HPAI outbreaks. *Id.* ¶¶ 200, 285, 290. Plaintiffs do not identify any supply decision by any specific Defendant. Instead, they rely on industry-wide USDA data about the aggregate size of the national laying flock. *Id.* ¶¶ 175, 283, 304, 306.

Plaintiffs' Complaints lean heavily on a civil complaint filed on June 29, 2026 by the DOJ and several states against just three of the Defendants here—Cal-Maine, Versova, and Hickman's—alleging coordinated bidding and producer-to-producer transactions to influence Urner Barry quotations through a cooperative labeled as "Co-Conspirator Cooperative A," which Plaintiffs identify as ProEgg. *Id.* ¶¶ 19, 111–12, 335. The allegations in that complaint are, of course, simply unproven allegations. While those Defendant entities entered into consent orders with the DOJ and certain state Attorneys General, they did not—and do not—admit the truth of

any of those allegations. In addition, the DOJ complaint names none of the other Defendants. *See United States v. Cal-Maine Foods, Inc. et al.*, 5:26-cv-04060-LTS-MAR (N.D. Iowa), ECF No. 1.

**F. Plaintiffs' Claims**

All three putative classes assert a single federal claim: a *per se* price-fixing conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1 and 3. The Commercial and Consumer Indirect Purchaser Plaintiffs also assert a series of state antitrust and consumer protection claims based on the same alleged conduct.

## LEGAL STANDARD

Under *Twombly*, courts must assess whether a plaintiff's "[f]actual allegations" suffice "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must be dismissed where plaintiffs fail to "nudge[ ] their claims across the line from conceivable to plausible." *Id.* at 570; *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 2020 WL 1666454, at *10 (N.D. Ill. Apr. 3, 2020) (allegations need "to push past the possible to the plausible"). The Court accepts well-pleaded facts as true, but not "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To bring a claim under Section 1 of the Sherman Act, Plaintiffs must allege "the existence of an agreement … through allegations of fact." *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021) (quoting *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 827 (7th Cir. 2019)).

"Courts apply the plausibility requirement with added rigor in the context of complex cases," particularly antitrust cases, because conspiracy allegations "are so easy to allege and so hard to prove." *Mountain Crest SRL, LLC v. Anheuser-Busch InBev SA/NV*, 456 F. Supp. 3d 1059, 1072 (W.D. Wis. 2020) (Peterson, J.) (citation modified). "Even at the pleading stage, it is

essential to show that a particular defendant joined the conspiracy and knew of its scope." *Id.* (citation modified). Moreover, "*Twombly* demonstrates that courts should dismiss antitrust conspiracy complaints for failure to state a claim when the allegations, taken as true, could just as easily reflect innocent conduct or rational self-interest." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 351 (7th Cir. 2022). This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## ARGUMENT

### I. COUNT I SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO ALLEGE ANY PLAUSIBLE CONSPIRACY

Plaintiffs' Sherman Act claim asserts that sixteen egg producers, a cooperative, Urner Barry, and ECI somehow, at some unspecified time and place, formed a conspiracy to orchestrate bids, manipulate Urner Barry's daily quotations, and restrict supply, all to inflate prices for numerous types, sizes, and grades of shell eggs nationwide. Plaintiffs' conclusory and group-pled allegations simply cannot support such a vast theory.

***First***, Plaintiffs fail to allege any direct evidence of an agreement among Defendants. "[D]irect evidence" is the proverbial "smoking gun," such as "an admission by an employee" that "defendants had met and agreed explicitly on the terms of a conspiracy to raise price." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010). The Complaints contain no such allegations. Plaintiffs attempt to cast as "direct evidence" a handful of inter-Defendant communications among only ***four*** of the ***sixteen*** producer Defendants, but none of them shows a conspiracy, let alone without inference, and certainly not one among all Defendants.

***Second***, Plaintiffs' circumstantial case fares no better. Plaintiffs' circumstantial case starts from a single fact—egg prices increased—and works backward, conjuring a conspiracy that makes no sense. Plaintiffs allege that sixteen differently situated producers (many of whom face

essentially ***zero*** allegations other than that they transacted on the egg spot market), an independent price-reporting agency (which Plaintiffs allege actively worked *against* those producers), and a spot-market exchange (which simply operates a platform) agreed to influence the prices of more than sixty distinct shell egg products, across six regional markets, amid years of supply turmoil.

The sheer breadth of Plaintiffs' theory is its undoing. Plaintiffs never explain how such a complex scheme came together or how it operated. Nor have Plaintiffs alleged the traditional hallmarks of circumstantial evidence: parallel conduct and plus factors. At bottom, Plaintiffs ask this Court to infer a sprawling conspiracy from higher egg prices during a historic avian flu outbreak, views on market conditions shared with Urner Barry, vague communications among *some* Defendants, and the ordinary trading practice of paying more (or less) depending on the supply and demand factors of the time. The law demands far more.

### A. The Complaints Fail to Allege Any Direct Evidence of an Agreement.

An agreement is the "fundamental prerequisite" for a Sherman Act Section 1 claim. *Contractor Util. Sales Co. v. Certain-teed Prods. Corp.*, 638 F.2d 1061, 1074 (7th Cir. 1981). Plaintiffs may plead that agreement through direct or circumstantial evidence, but "direct evidence" is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004). It is the "smoking gun": an admission "that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price," *In re Text Messaging Antitrust Litig.*, 630 F.3d at 628, a "memorandum … detailing the discussions from a meeting of a group of alleged conspirators," *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 52 (3d Cir. 2007), or a "recorded phone call in which" the conspirators agreed, *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). Moreover, courts routinely dismiss conspiracy claims where, as here, the plaintiffs cast a wide net but allege that only *some* of the defendants

communicated during a short subset of the alleged conspiracy period. *See In re Treasury Sec. Auction Antitrust Litig.*, 595 F. Supp. 3d 22, 45 (S.D.N.Y. 2022) (dismissing bid-rigging claims based on chats where "the chats are limited to a one-year period and involve only three of the Auction Defendants" and "chat participants do not reference any sort of agreement among themselves").

Plaintiffs have pleaded no direct evidence here. Plaintiffs do not allege any admission, phone call, meeting, memorandum, or other communication in which all nineteen Defendant families agreed on ***anything***, let alone to fix the price of eggs, to manipulate Urner Barry's quotations, or to restrict egg supply.

**No Direct Evidence of Price Fixing.** Conclusory allegations that Defendants "agree[d] with each other" to fix egg prices are not sufficient to withstand a motion to dismiss. DPP Compl. ¶ 382; *see Twombly*, 550 U.S. at 557 ("a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"). This is not a conventional price-fixing case. Plaintiffs allege ***no*** conversation in which ***any*** Defendants agreed on the price at which they would sell eggs to their customers, or even on a price range, premium, or formula for those sales. Nor do they identify the market price supposedly agreed upon, when or by whom that agreement was reached, or how it applied across the different grades, sizes, types, and regional quotations that the Complaints acknowledge. DPP Compl. ¶¶ 7, 184–86. Plaintiffs allege only that particular pairs of Defendants bought and sold eggs between themselves at certain prices.

**No Direct Evidence of Benchmark Manipulation.** Lacking any direct evidence of an agreement to fix prices to customers, Plaintiffs pivot to a theory that Defendants manipulated Urner Barry by coordinating bids and transactions with each other, and then reporting them to Urner Barry. In support of that theory, Plaintiffs offer only a handful of communications among a small

subset of Defendants. *See, e.g.*, *id.* ¶¶ 4, 230, 245, 247, 249, 251–52, 254. But those communications are not direct evidence of any conspiracy, much less one among all nineteen Defendant families. The Complaints contain ***zero*** direct evidence that these nineteen Defendant families ***agreed*** to do any of these things with each other.

A handful of Defendants exchanging vague messages on a handful of days is not direct evidence of a conspiracy. For example, Plaintiffs cite a Cal-Maine executive's text to Hickman's CEO, noting "We are bidding up. Let's hold it today." *Id.* ¶ 245. Even setting aside that the message involves only two Defendants and is unrelated to the other Defendants, it does ***not*** concede an agreement between Cal-Maine and Hickman's, much less one tailored to Plaintiffs' alleged class period and their "shell eggs" product market. It thus fails the test that direct evidence must be "explicit and require[] no inferences." *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 950 (N.D. Ill. 2014).

The same is true of the December 2022 Hickman's emails suggesting others bid for "additional loads" or to bid "early and often." DPP Compl. ¶¶ 247, 249, 252. These alleged communications spanned only a few days and went to only a handful of members of a cooperative—Hickman's, Cal-Maine, and Versova—who were tasked with supplying customers through that cooperative. Those are exactly the communications one would expect among cooperative members, and at most, they reflect one person's suggestion the recipients were free to ignore. They say nothing about any other Defendant or their collective behavior over the duration of the alleged conspiracy.

Likewise, Plaintiffs allege that in August 2023, a Cal-Maine executive asked a Versova executive whether Versova had eggs to sell, noting that Urner Barry's reporter "needs premium trades to hang her hat on." *Id.* ¶ 230. That reflects nothing more than a bilateral negotiation

resulting in completed purchases that Cal-Maine then reported—precisely the information Urner Barry's methodology seeks. *Id.* ¶¶ 184, 204. Similarly, Plaintiffs allege that in December 2022, one Versova employee told another to delete Northwest bids that were "getting hit," suggesting "Versova did not actually need the eggs." *Id.* ¶ 253. But this at best describes one company's internal trading decision on one day. None of these communications constitutes direct evidence of Plaintiffs' alleged conspiracy.

**No Direct Evidence of a Supply Restriction.** Plaintiffs also allege an agreement to slow flock restoration after outbreaks of HPAI—but do not even attempt to allege direct support for such a conspiracy. The Complaints identify no email, text, call, meeting, instruction, or other communication in which any Defendant discussed any common understanding as to supply. Plaintiffs instead allege that Defendants "manufactured a story of scarcity to inflate the benchmark, then made just enough of that scarcity real to keep prices from collapsing," relying entirely on aggregate USDA data about the national laying flock. *Id.* ¶¶ 200, 283, 304, 306. Aggregated, industry-wide data is not evidence of a conspiracy, direct or circumstantial.

The Complaints contain no inference-free factual allegations tying the constellation of Defendants named here to ***any*** agreement. There is simply no smoking gun.

### B. Plaintiffs Fail to Allege Any Circumstantial Evidence of an Agreement.

Plaintiffs do not sufficiently plead their claims through circumstantial evidence either. Absent direct evidence, Plaintiffs must allege facts suggesting that Defendants had a "conscious commitment to a common scheme" to fix egg prices. *Marion Diagnostic*, 29 F.4th at 349 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)). And, importantly, the alleged conspiracy must "make practical, economic sense." *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 281 (4th Cir. 2012) (affirming dismissal); *In re Crop Inputs Antitrust Litig.*, 172 F.4th 570,

577 (8th Cir. 2026) ("Whether the complaint as a whole states a plausible claim for relief is a context-specific task that requires the court to draw on judicial experience and common sense").

This one does not. Plaintiffs rely on conclusory allegations and group pleading to lump together a group of Defendants against whom they allege materially different, and often no substantive, conduct; they offer no explanation of how such a sprawling, multi-product, multi-region scheme could work; and through their own allegations contradict the plausibility of any mechanism by which Defendants could control Urner Barry's quotations. Plaintiffs also do not adequately allege the classic tenets of circumstantial evidence: parallel conduct and plus factors. Plaintiffs' claims therefore fail as to every Defendant.

**1. Plaintiffs' Alleged Conspiracy Is Facially Implausible.**

The sprawling conspiracy Plaintiffs have alleged is implausible on its face. The touchstone of inferring an agreement from circumstantial evidence is plausibility. *Twombly*, 550 U.S. at 564. Plaintiffs' theory—that sixteen differently situated egg producers, a cooperative, a price-reporting agency, and a trading platform together fixed dozens of distinct prices across six regional markets, beginning just as a catastrophic disease outbreak struck their flocks—fails this basic test and does not make practical or economic sense. *See Washington Cnty. Health Care Auth.*, 2020 WL 1666454, at *7 (claims "should be dismissed if common economic experience" invalidates conspiracy theory) (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010)).

***a. Plaintiffs Arbitrarily Lump Together Various Defendants with Nothing to Connect Them to a Conspiracy.***

As this Court has recognized, "[e]ven at the pleading stage, it is essential to show that a particular defendant joined the conspiracy and knew of its scope." *Mountain Crest SRL, LLC*, 456 F. Supp. 3d at 1072; *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("A complaint

based on a theory of collective responsibility must be dismissed."). The Complaints instead treat a disparate group of egg producers as one undifferentiated bloc, and attribute rising prices of sixty-plus shell egg products across the entire country to all of the Defendants. That is precisely the group pleading courts reject. *See In re Pork Antitrust Litig.*, 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019) ("Without specific information regarding each Defendant, the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted.").

For example, for Sparboe, the Complaints allege ***no*** communications with Urner Barry aimed at influencing Urner Barry's quotations. For Prairie Star, Plaintiffs allege only generically that it [redacted] DPP Compl. ¶ 218. For Hillandale and Sparboe, Plaintiffs allege no specific above-index trades with other Defendants—only a bare assertion that [redacted] *Id.* ¶ 192. For other Defendants, like Cooper Farms, Daybreak, Hidden Villa, Kreider Farms, MPS, Opal, Pearl Valley, Rose Acre, and Weaver Brothers, Plaintiffs allege only that they [redacted]—the ordinary conduct of any seller in a rising market. *See, e.g.*, *id.* ¶¶ 218, 229, 232, 235–36, 238. Beyond that, the Complaints offer only boilerplate allegations that such Defendants "subscribed to Urner Barry" and "participated in the conspiracy." *See, e.g.*, *id.* ¶¶ 42, 47, 89, 140.

How did sixteen producer families of vastly different sizes, operating across six distinct regional markets, reach a common understanding? Who initiated it? Who agreed? And what did they agree to? The Complaints are silent as to all of these important questions, which is fatal to Plaintiffs' claims. *Compare Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 2020 WL 5642941, at *9 (N.D. Ill. Sept. 22, 2020), *aff'd*, 15 F.4th 831 (7th Cir. 2021)

(dismissing where "there are no plausible factual allegations about *how* [supposed conspirators] entered into an arrangement" (emphasis added)); *with In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 34 (D.D.C. 2008) (permitting conspiracy claim because the plaintiffs had alleged "where and when the agreement was reached" including "who initiated the discussions … [and] what they proposed"). Nor do the few communications Plaintiffs cite tie the group together. Plaintiffs cite only ambiguous communications among Hickman's, Cal-Maine, Versova, and ProEgg. *See supra* § I.A. Plaintiffs do not allege they had anything to do with any other Defendant, much less the sweeping, industry-wide conspiracy Plaintiffs allege.

The inclusion of Urner Barry and ECI as Defendants makes the theory less plausible still. To be sure, "intermediaries can be liable under § 1 if they facilitate the making or enforcement of an agreement among producers." *Amory Invs. LLC v. Utrecht-Am. Holdings, Inc.*, 74 F.4th 525, 527 (7th Cir. 2023). But the Seventh Circuit has made clear what that requires: allegations that the intermediary "served as a conduit for the producers' agreement," "helped them coordinate their production and catch cheaters," or at least "knew that the producers were coordinating among themselves." *Id.* at 526–27. And "the allegations of communication must be strong," it is not enough to "show that [the intermediary] had a close relationship with some of the defendants." *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1262084, at *1 (N.D. Ill. Feb. 11, 2022), *aff'd sub nom. Amory*, 74 F.4th 525.

The Complaints allege none of this. They do not allege that Urner Barry or ECI conveyed confidential information between producers, helped any producer coordinate bids or supply, policed compliance with any agreement, or even knew of one. Plaintiffs allege only that Urner Barry did what it has done "for over a century"—gathered information from [redacted] and published quotations, DPP Compl. ¶¶ 129, 183—and that

ECI operated a blind-bid spot market. That describes two businesses serving buyers and sellers alike, not facilitators of a conspiracy. Indeed, Plaintiffs' own allegations cut the other way: Urner Barry resisted producers' requests. *Id.* ¶¶ 266, 275. As in *Amory*, nothing in the Complaints plausibly suggests that Urner Barry or ECI joined, facilitated, or had any incentive to facilitate any agreement among producers. Sweeping them into the alleged conspiracy only underscores the implausibility of Plaintiffs' allegations.

#### ***b. No Single Scheme Could Fix Prices of Sixty-Plus Products Across Six Regional Markets.***

The alleged product market makes Plaintiffs' theory more implausible still. The alleged conspiracy spans over sixty different egg products and six regional markets. Urner Barry publishes separate daily quotations by grade, size, color, housing type, and region. DPP Compl. ¶¶ 176, 181. Plaintiffs' theory thus requires that all sixteen egg producer Defendants agreed to fix the prices of dozens of distinct product-region combinations, each with its own daily quotation. Yet, the Complaints never allege which Defendants sold which products, or agreed to do anything as to any of them. Indeed, the actual transactions Plaintiffs cite involve only a handful of these categories—overwhelmingly large white caged or cage-free eggs in specific regions. *See, e.g.*, *id.* ¶¶ 215, 217, 223, 227, 232–34, 236; *see also id.* ¶¶ 219–22 (large caged eggs); ¶¶ 228–29, 237, 239–40 (identifying no specific products at all). Plaintiffs never explain how trades in one product category (*e.g.*, large white cage-free eggs in California) could move the quotation for a different product category (*e.g.*, medium brown conventional eggs in the Midwest), what mechanism coordinated pricing across them (specialty eggs—including organic, free-range, and pasture-raised products—are not quoted by Urner Barry at all), or even whether all Defendants sell all of these products.

Geography only compounds the problem. Prices vary significantly across Urner Barry's six regions, *id.* ¶ 181, and some Defendants do not operate nationally at all. ProEgg, for example, is alleged to sell only in western states. *Id.* ¶ 110. Plaintiffs do not explain how a cooperative with no presence in the Northeast or Southeast could have helped allegedly inflate prices there. Plaintiffs' assertion that a single conspiracy could span these Defendants, products, and regions, on top of all the other facial defects in Plaintiffs' theory, impermissibly requires a "speculative leap, not reasonable inference." *Alarm Detection Sys.*, 930 F.3d at 828.

#### c. *Plaintiffs Do Not—and Cannot—Allege Any Plausible Mechanism for Manipulation.*

Plaintiffs' theory depends on a mechanism that, by their own account, did not and could not have worked. Plaintiffs allege that Defendants manipulated Urner Barry's quotations by feeding it inflated trades, aggressive bids, and bullish market commentary. But the quotations Plaintiffs describe draw information from [redacted], DPP Compl. ¶ 183, and weigh those inputs using the subjective judgment of Urner Barry personnel who, as Plaintiffs repeatedly allege, resisted producers' requests, *id.* ¶¶ 266, 274–75. *See infra* § I.B.2.a. The Complaints themselves establish that the producers could not plausibly have controlled such quotations.

That sets this case apart from those in which courts have sustained a complaint alleging that a price-reporting mechanism facilitated a conspiracy. In *Broilers*, defendants allegedly exercised "direct control" over an unverified index through a secret advisory committee, and the index diverged from independently verified benchmarks—including Urner Barry. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 786 (N.D. Ill. 2017). More recently, in *PVC*, the plaintiffs alleged that defendants supplied the sole reporter for a subscription-only newsletter "detailed non-public information about their current and future operations including pricing," that

the reporter ferried messages between competitors, "often relaying messages verbatim" about price increase announcements, and that the newsletters commented on whether the defendant converters were maintaining "discipline," after which defendants issued identical price sheets within hours. *In re PVC Antitrust Litig.*, 2026 WL 2943355, at *14–15 (N.D. Ill. Sep. 30, 2026). Plaintiffs here allege nothing of the kind. They do not, and cannot, allege that producer Defendants exercised direct control over Urner Barry. They do not allege that Urner Barry passed one producer's message to another, disclosed any producer's non-public information, or published anything other than its own assessment of the market. Nor do they allege that any Defendant learned of another's pricing intentions through Urner Barry. Instead, Plaintiffs describe a reporting agency that gathered information from [redacted], DPP Compl. ¶ 183, and used its own independent judgment, including by pushing back when producers allegedly pressed for higher prices, *id.* ¶¶ 266, 275.

Moreover, Plaintiffs' own examples fail to connect any alleged "inflated" trade to any actual movement in the Urner Barry benchmark. Urner Barry, as Plaintiffs acknowledge, begins gathering information for each day's report [redacted] *Id.* ¶ 183. A trade on one day, then, should show up in the next day's quotation, and a few cents of premium should move the quotation by roughly that amount. Plaintiffs instead pair a trade on one day with a quotation published days or weeks later, after many intervening trading days, and credit the entire increase to that inter-Defendant trade. For example, Plaintiffs allege that [redacted]—well *above* the trades, and only after weeks of purchases on unspecified dates, at unspecified prices, by unspecified parties. *Id.* ¶ 217. In September 2022, a handful of trades between [redacted]

[redacted] *id.* ¶ 219—an increase those trades cannot explain and one that implies Urner Barry was seeing broad evidence of higher prices across the market. And Plaintiffs summarily state that, [redacted]—picking a benchmark on a date more than a week later. *See, e.g.*, *id.* ¶¶ 232–34. Despite having access to Urner Barry's documents, Plaintiffs do not allege facts that establish that any inter-Defendant trade actually changed the Urner Barry benchmark, much less improperly manipulated it.

**2. Plaintiffs Fail to Allege Parallel Conduct.**

Plaintiffs additionally have not adequately pleaded the traditional hallmarks of circumstantial evidence: parallel conduct and plus factors. To state a claim under Section 1 of the Sherman Act based on circumstantial evidence, Plaintiffs must allege ***both*** parallel conduct, *i.e.*, facts indicating that the defendants acted similarly, and "plus factors" sufficient to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. The failure to plead parallel conduct is, by itself, fatal. *See Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516–17 (8th Cir. 2018) (affirming dismissal and declining to reach plus factors).

The Eighth Circuit recently affirmed dismissal of conspiracy allegations in *Crop Inputs*, holding that isolated, defendant-specific conduct does not constitute parallel conduct; rather, parallel conduct "consists of acts that are similar in substance, executed under similar circumstances, and close in time." *In re Crop Inputs Antitrust Litig.*, 172 F.4th at 578. There, plaintiffs alleged that the defendants conspired to boycott e-commerce platforms to keep crop-input prices inflated, but supported that theory with a patchwork of one-off acts by individual defendants—one retailer's letter disparaging a platform, one manufacturer's internal task force,

another manufacturer's executive's statement—without alleging that any other defendant did the same. *Id.* at 575–76, 578–79. The Eighth Circuit held that allegations attributing conduct to "Manufacturer Defendants," "Wholesaler Defendants," or "Retailer Defendants" generally "without imputing concrete acts to specific litigants" were "impermissible group pleading" that failed to plead "who, did what, to whom (or with whom), where, and when." *Id.* at 577–78 (citation modified). Parallel conduct, in other words, must be alleged defendant by defendant. A plaintiff "cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015); *see Bank of Am., N.A.*, 725 F.3d at 818 ("[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful").

That requirement is dispositive here. The Complaints are rich in *conclusions* that "Defendants" acted together, but every category of alleged parallel conduct rests on impermissible group pleading. Plaintiffs' bidding theory rests on a handful of episodes involving at most four Defendants (one of whom—ProEgg—is a cooperative whose members include the other three). *See infra* § I.B.2.a. And their supply theory relies entirely on market-wide figures that do not attribute any supply decision to any Defendant. *Infra* § I.B.2.b. Neither pleads conduct that is defendant-specific or similar enough in substance, timing, or effect to infer a horizontal agreement among nineteen Defendant families.

***a. Plaintiffs' Bidding and Transaction Allegations Fail to Plead Parallel Conduct and Instead Attempt to Impute Isolated Conduct by a Few Defendants to All.***

Plaintiffs' allegations regarding bidding and bilateral transactions do not constitute parallel conduct. Plaintiffs' allegations focus on only a handful of Defendants, do not plead parallel conduct even as to those Defendants, and describe nothing more than business-as-usual conduct by companies committed to serving their customers.

Plaintiffs' allegations center on four Defendants: Cal-Maine, Hickman's, Versova, and ProEgg (which, at the time of most of the alleged communications, included all three individual companies). That is true for Plaintiffs' allegations of coordinated bidding, DPP Compl. ¶¶ 245, 247, 249, 251–54, 256, as well as inter-Defendant transactions. *E.g.*, *id.* ¶¶ 190–94, 215–29, 232–41. At the threshold, that cannot establish parallel conduct of the conspiracy Plaintiffs allege in their Complaints or agreement among nineteen Defendant families. Nor can it state any claim against the Defendants that Plaintiffs ignore. Either way, courts routinely reject efforts to infer an industry-wide agreement from conduct by a small subset of defendants, over only a short span of the total alleged conspiracy period. *See Dorrell v. Constellation Energy Corp.*, 2026 WL 2249275, at *12 (D. Md. Aug. 5, 2026) (allegations concerning six of forty-five defendants during nine years of a twenty-three-year class period insufficient, as "[i]solating less than one-fourth of the Defendants" does not plead parallel conduct); *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 399 (2d Cir. 2024) ("five bilateral chat excerpts confined to one full year" could not support conspiracy spanning "eight-and-a-half years"); *In re Treasury*, 595 F. Supp. 3d at 44–49 ("five isolated, bilateral chat excerpts" involving traders from only "[a few] of the Auction Defendants" were insufficient). Instead, "[m]uch more is required, namely, specific allegations that demonstrate parallel conduct and tie each defendant to the alleged price-fixing scheme." *Oklahoma Firefighters Pension & Ret. Sys. v. Deutsche Bank Aktiengesellschaft*, 2024 WL 4202680, at *8 (S.D.N.Y. Sept. 13, 2024). Plaintiffs do not meet that standard here.

In any event, Plaintiffs do not plead parallel conduct by Cal-Maine, Hickman's, Versova, or ProEgg. The Complaints identify only three short windows of allegedly coordinated bidding among these Defendants (October 2022, December 2022, and December 2024) in the alleged multi-year class period. DPP Compl. ¶¶ 245, 247, 249, 251–54, 256. This episodic pleading

cannot sustain their broad conspiracy claim. Throughout the alleged period, the alleged transactions have varied pricing, different products, different counterparties, and different timing. *See, e.g.*, *id.* ¶ 215 ([redacted]); *id.* ¶ 218 ([redacted]); *id.* ¶ 232 ([redacted]); *id.* ¶ 236 ([redacted]). Plaintiffs allege only one Versova transaction—three private trades with Cal-Maine at "premium prices" in August 2023, with no specifics regarding what product or volume they were buying and selling, or what the "premium price[]" even was. *Id.* ¶ 230. Plaintiffs do not allege that Cal-Maine, Hickman's, or Versova knew of, much less coordinated with, one another's trades, or that those trades followed any common pattern of timing, product, region, or price. Accordingly, those allegations do not constitute parallel conduct that was "similar in substance, executed under similar circumstances, and close in time." *Crop Inputs*, 172 F.4th at 578; *Dorrell,* 2026 WL 2249275, at *12 (no parallel conduct regarding wage fixing where plaintiffs' examples involved "different tenures and without clear alignment of job responsibilities"); *In re Concrete & Cement Additives Antitrust Litig.*, 2025 WL 1755193, at *14 (S.D.N.Y. June 25, 2025) (no parallel conduct where the "price increases alleged by Plaintiffs were episodic and inconsistent with coordinated activity"); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (dismissing where defendants engaged in conduct "over a period of several years, not simultaneously").

Finally, Plaintiffs' own allegations establish why no conspiracy can be inferred from even these episodes. Plaintiffs concede that Cal-Maine, Hickman's, and other producers operate under a "net short" model and must "routinely procure eggs from other egg producers" to meet existing customer demand. DPP Compl. ¶ 195. In that scenario, and particularly when HPAI culled tens

of millions of hens while those customer obligations remained, net-short buyers naturally bid for eggs and paid premiums to secure scarce supply. Plaintiffs' own example confirms as much: [redacted] *Id.* ¶ 220. By contrast, a non-defendant producer with "[redacted]" told Urner Barry [redacted] *Id.* ¶ 278. Because these buyers resold under contracts priced off the Urner Barry quotation, and that quotation generally [redacted]—as Plaintiffs allege it does, *see id.* ¶ 207—egg producers had every independent reason to want the index to catch up. Reporting completed trades to Urner Barry, which [redacted] from producers every day, *id.* ¶¶ 183–84, would serve to help narrow the gap between what those producers paid and what they could recoup. *See supra* § I.B.1; *infra* § I.B.3.a.

Where, as here, the conduct alleged is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market," it cannot support a plausible inference of conspiracy. *In re Passenger Vehicle Replacement Tires Antitrust Litig. ("Tires")*, 767 F. Supp. 3d 681, 711 (N.D. Ohio 2025) (price increases were indicative of "a market being impacted by the COVID-19 pandemic") (quoting *Twombly*, 550 U.S. at 554); *Dorrell*, 2026 WL 2249275, at *12 (pay increases that "align[ed] with average inflation rates" did not suggest agreement, because such "disconnected increases are just as indicative of inflation as they are of collusion") (citation modified).

Plaintiffs' allegations amount to nothing more than episodic transactions among a handful of Defendants, scattered across a multi-year class period and explained by Plaintiffs' own account of net-short buying. That is not parallel conduct by those few Defendants, let alone by the many Defendants named here.

### *b. Plaintiffs Allege No Parallel Defendant-Specific Supply Reductions.*

Plaintiffs also fail to allege parallel conduct to suppress supply. Plaintiffs do not allege a single supply decision by a single Defendant, let alone a series of parallel supply decisions across Defendants. Indeed, Plaintiffs allege ***no*** communications by Defendants regarding supply, and ***no*** allegations regarding any specific Defendant's supply decisions. Such a deficiency warrants dismissal where, as here, the court cannot analyze "which, how many, or when any of the individual Defendants may have affirmatively acted to reduce the supply of [eggs]." *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *8. And the aggregated, market-wide data Plaintiffs attempt to rely on cannot substitute for defendant-specific allegations. *See City of Pontiac*, 92 F.4th at 398–99 (describing data that "obscure[s] whether any of the Auction Defendants—and if so, which—were driving the supposed market irregularities" as "fail[ing] to demonstrate parallel conduct"); *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012) (aggregated data are "simply descriptions of the market, not allegations of anything that the defendants did"); *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 365 (S.D.N.Y. 2019) (holding that because "it is impossible to have any confidence that the statistics actually capture something different about each and every defendant," the allegations at best evidence a "conspiracy [that] could well have involved some of [the defendants], or none of them, or a mix of the named defendants and other" market participants) (emphasis omitted). Plaintiffs plead, at most, an industry-wide outcome, not parallel conduct by the named Defendants.

Plaintiffs' industry-wide supply allegations reveal their inability to establish parallel conduct. Plaintiffs allege that the *national* egg-laying flock did not return to its pre-outbreak level of "roughly 330 million hens" and that the industry ***as a whole*** added "roughly 20 million fewer pullets during the Class Period." DPP Compl. ¶¶ 290–93. They similarly invoke the national

USDA flock and production figures, *id.* ¶¶ 283, 300–06, 312, and an industry-wide "In a Molt" percentage for "United States egg production," *id.* ¶¶ 174–75. Those figures cannot show that any two Defendants did the same thing at the same time, let alone that all of them did. An industry-wide shortfall is equally consistent with some producers restocking quickly and others slowly, producers shifting to cage-free following state law mandates, or differences driven entirely by when and where HPAI struck, and varying customer demands. Nor do the figures show that any Defendant *intended* to restrict output at all. By Plaintiffs' own account, HPAI wiped out more than 43 million egg-laying hens during the alleged class period. *Id.* ¶ 298. Plaintiffs do not (and cannot) distinguish between alleged intentional flock reductions and involuntary HPAI losses. Industry-wide supply figures cannot establish parallel conduct, yet they are all Plaintiffs offer. This defect alone is fatal to Plaintiffs' circumstantial supply theory. *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *8.

### 3. Plaintiffs' Alleged "Plus Factors" Do Not Support the Inference of a Conspiracy.

Where Plaintiffs fail to plausibly plead parallel conduct, "no discussion of any 'plus factors' is necessary." *Park Irmat*, 911 F.3d at 517; *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 391 (S.D.N.Y. 2019) (plus factors, absent adequately pled parallel conduct, are "insufficient to state an antitrust claim"). Plus factors are circumstances beyond parallel conduct showing that Defendants' conduct was not the result of mere "interdependence," *i.e.*, "rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554. Even had Plaintiffs identified any parallel conduct (they have not), their purported plus factors do not move their allegations from conscious parallelism to conspiracy. *Id.* at 553–54.

### a. ***Plaintiffs Do Not Plead that Defendants Acted Against Their Independent Self-Interest.***

Action against independent self-interest is "generally considered the most important 'plus factor.'" *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 596 (S.D. Tex. 2022). Plaintiffs point to a variety of Defendant actions that they claim were against Defendants' independent self-interest. But even a cursory review shows that each action Plaintiffs identify was in *pursuit* of each Defendant's independent self-interest.

***First***, Plaintiffs label every trade above that day's Urner Barry quotation a "premium" trade that makes sense only as part of a conspiracy to push the quotation upward.[7] Not so. As explained above, a producer may have myriad, non-conspiratorial reasons to buy eggs at a "premium" to the quotation. Indeed, some net-short producers facing an HPAI-driven shortage had every independent reason to pay above a lagging quotation to meet their customer obligations, and to want Urner Barry to reflect the prices they were actually paying—no producer wants to buy eggs for more than it can resell them. *See supra* § I.B.2.a. Plaintiffs themselves describe these as "completed, bona fide trades," DPP Compl. ¶ 214, and executed trades, *e.g.*, *id.* ¶¶ 215, 218, 220, and concede that not *all* reported bids were above the quotation, *id.* ¶ 249 (describing "most" bids as "at premium prices"). That is basic economics, not conspiracy. *See Amory Invs. LLC*, 74 F.4th at 527 (noting that the fact that "lower output implies higher prices" was "Economics 101" and statements to that effect "d[id] not violate the Sherman Act"); *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1262084, at *1 (the same was "an obvious statement of the law of supply and demand").

[7] Whether a trade was in fact a "premium" depends on timing. Plaintiffs measure the alleged premium against the Urner Barry quotation on the day a trade was struck, but the ultimate price is often set in relation to the quotation on the day of delivery, which may be days later. *See* DPP Compl. ¶¶ 190–91, 196 n.7 ([redacted]); *id.* ¶ 273 (eggs [redacted]). In a rising market, a price that appears above the quotation on the day of the trade may actually be at or *below* the quotation by the time the eggs are delivered.

***Second***, the pace of flock restoration reflects prudent management during a multi-year outbreak, not restraint against self-interest. Plaintiffs' own allegations show producers *expanded* the number of fertilized eggs, DPP Compl. ¶ 293, and that the recurring waves of HPAI prevented a 2015-style rebuild, *supra* Background § D. Producers may ramp up production quickly under *normal conditions*, when they can recoup that investment by capitalizing on high prices. *See* DPP Compl. ¶ 286. But when each new wave can wipe out a newly restocked flock, and costs have risen, *id.* ¶ 315, declining to invest heavily all at once in replacement flocks is prudent risk management—not conspiracy. *See Tires*, 767 F. Supp. 3d at 710–11 (rejecting argument that pace of price recovery indicated conspiracy where external disruptions provided obvious alternative explanation).

***Third***, participating in a century-old price-reporting service that buyers use too, *supra* Background § C.3, is lawful, rational, and procompetitive. *See Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1084 (9th Cir. 2025). Indeed, even as to Agri Stats—a tool with far more granular defendant-specific data than alleged here—a court in this Circuit recognized that "what is irrational is to refrain from participation in [a benchmarking service] when all your competitors are doing so." *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 674 (N.D. Ill. 2023); *Perdue Farms, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 517 F. Supp. 3d 458, 464 (D. Md. 2021) ("[T]here is nothing inherently anticompetitive or illegal about using data benchmarking services like Agri Stats"). This "most important 'plus factor'" favors Defendants. *JSW Steel*, 586 F. Supp. 3d at 596.[8]

---

[8] Plaintiffs also do not even attempt to allege any monitoring or enforcement mechanisms, without which there can be no plausible conspiracy. *See Segal v. Amadeus IT Group, S.A.*, 2026 WL 879583, at *6 (N.D. Ill. Mar. 31, 2026) (granting motion to dismiss where plaintiffs "allege[d] no enforcement mechanism to prevent each [] defendant from cheating by lowering [] rates amidst declining demand"); *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989) ("These enforcement mechanisms are the 'restraints' of trade. Without them there is only uncoordinated individual action, the essence of competition.").

### *b. Plaintiffs' Generic Allegations About the Market Structure of the Shell Egg Industry Are Insufficient to Support a Plausible Inference of Conspiracy.*

Plaintiffs' market-structure allegations—common motive to increase revenue (true of any for-profit company), fungible product (the definition of a commodity), and high barriers to entry (true of any large-scale agricultural endeavor)—could describe hundreds of industries. DPP Compl. ¶¶ 346–52. Such features "make it easier for companies either to form a cartel ***or*** to follow the leader independently," *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 935 (7th Cir. 2018) (emphasis added), and thus "do[] nothing to explain whether the parallel pricing was achieved by agreement or mere interdependent decisions." *White v. R.M. Packer Co.*, 635 F.3d 571, 580 (1st Cir. 2011).

Plaintiffs' concentration theory fails on its own terms. Plaintiffs allege that ***sixteen*** egg producer Defendants control approximately 73% of all U.S. egg-laying hens, DPP Compl. ¶ 166, leaving more than a quarter of the market outside this case despite the sheer number of Defendants.[9] By contrast, in *Beef*, *Pork*, and *Turkey*, far fewer defendants allegedly controlled over 80% of their markets. *See In re Cattle & Beef Antitrust Litig.*, No. 0:22-md-3031, ECF No. 132 at ¶ 212 (D. Minn. Jan. 30, 2023) (four defendant families); *In re Pork Antitrust Litig.*, No. 0:18-cv-01776, ECF No. 1 at ¶ 71 (D. Minn. June 28, 2018) (eight defendants); *In re Turkey Antitrust Litig.*, No. 1:19-cv-08318, ECF No. 1 at ¶ 1 (N.D. Ill. Dec. 19, 2019) (nine defendant families and three co-conspirators). Similarly, barrier-to-entry allegations "are simply descriptions of the market, not allegations of anything that the defendants did," and cannot "give rise to an

---

[9] Indeed, the market Plaintiffs describe, with sixteen egg producer Defendant families (and many more unnamed producers) and no single competitor controlling more than "approximately 20% of national egg sales," DPP Compl. ¶ 166, does not constitute, and in fact is far from, the kind of "highly concentrated market" that is "presumptively susceptible to collusion" within the meaning of the federal Merger Guidelines. *See* U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines §§ 2.1, 2.3 (2023) (defining "highly concentrated" markets as those with a Herfindahl-Hirschman Index greater than 1,800).

inference of an unlawful agreement." *Erie Cnty., Ohio*, 702 F.3d at 870. Indeed, the "financial, regulatory, operational, and logistical costs" Plaintiffs cite, DPP Compl. ¶¶ 359–60, describe any agricultural commodity market. Plaintiffs' market structure allegations do not move Plaintiffs' claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

#### *c. Trade Association and Trade Show Participation Do Not Plausibly Suggest a Conspiracy.*

Plaintiffs allege that Defendants' membership in United Egg Producers ("UEP") and the American Egg Board ("AEB"), and their attendance at their meetings and at Urner Barry's annual Executive Conference, created "opportunities to collude." DPP Compl. ¶¶ 353, 357. But the Seventh Circuit as well as four other courts of appeals have held that the "opportunity to conspire" through trade associations "does not necessarily imply that wrongdoing *occurred*." *Kleen Prods. LLC*, 910 F.3d at 938 (emphasis in original); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 349–50; *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009); *Musical Instruments*, 798 F.3d at 1196. Joint membership is "lawful parallel conduct," *Twombly*, 550 U.S. at 556–57, and associations serve "legitimate functions, such as providing information to industry members," *Musical Instruments*, 798 F.3d at 1196—including, as Plaintiffs concede, allowing attendees "to network, learn and advance their professional development." DPP Compl. ¶ 357.

In any case, most importantly, the Complaints allege ***no improper communications*** at any of these events, let alone price increases or supply reductions keyed to these events—only that executives of some Defendants served on UEP's board, were "seen together at these conferences," and were "photographed together." *Id.* ¶ 357. "Absent additional facts addressing the content of defendants' discussions," such allegations "are unspectacular and fail to move the needle." *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 843 (N.D. Ill.

2018); *contrast In re PVC Antitrust Litig.*, 2026 WL 2943355, at *4–5 (treating trade association meetings as a plus factor only where plaintiffs alleged defendants issued new identical price sheets shortly after them, and that one defendant reported discussing a competitor's pricing with another at such a meeting).

#### ***d. Prior Litigation and Government Enforcement Allegations Are Insufficient to Plausibly Suggest a Conspiracy Among All Defendants.***

Plaintiffs cite two categories of prior legal proceedings as "plus factors": (1) the DOJ's June 2026 civil complaint against Cal-Maine, Versova, and Hickman's; and (2) the 2008 *Processed Egg Products* MDL and ultimate jury verdict in just one of the MDL cases, *Kraft Foods*. Neither combines the array of Defendants Plaintiffs have compiled here, nor supports an inference of conspiracy.

***First***, a settlement with the DOJ with no admission of liability is not indicative of a conspiracy—certainly not the broad conspiracy alleged here. The DOJ's complaint names only *three* Defendants—Cal-Maine, Versova, and Hickman's—and concerns coordination through "Co-Conspirator Cooperative A," which the Complaints identify as ProEgg. *See* DPP Compl. ¶¶ 111–12. ***None*** of the other Defendants aside from Opal (and a different Oakdell entity) are alleged to have been involved in ProEgg. And a complaint filed along with an agreed settlement is not evidence, where the DOJ's claims are untested and unadjudicated, and no defendant in that case has admitted liability. *See Tires*, 767 F. Supp. 3d at 739–40 (giving "no weight" to settlements or proceedings without any admission of wrongdoing).

That prices allegedly declined following the DOJ investigation, DPP Compl. ¶¶ 19, 328–33, changes nothing. By Plaintiffs' own account, prices had just reached an all-time high of roughly $6.23 per dozen in March 2025, *id.* ¶¶ 197, 294, and market participants were already reporting that [redacted] in February 2025, *id.* ¶ 240 & n.9. Accusations

and admitted market dynamics cannot substitute for allegations establishing a plausible conspiracy.

***Second***, alleging that some of the Defendants have been sued before is not a viable plus factor. Plaintiffs invoke the *Processed Egg Products* litigation and subsequent *Kraft Foods Global, Inc. v. United Egg Producers* jury verdict, *id.* ¶¶ 343–45, but Plaintiffs fail to include that a jury found in favor of the ***defendants*** in two *Processed Egg Products* trials, and those victories were upheld on appeal. *See In re Processed Egg Prods. Antitrust Litig.*, 850 F. App'x 142 (3d Cir. 2021); *In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d 719 (3d Cir. 2020). In any event, prior litigation cannot be used as evidence that a defendant participated in a conspiracy. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (rejecting an "if it happened there, it could have happened here" argument that prior findings of antitrust liability in Europe made the plaintiffs' claims plausible); *Rozema v. Marshfield Clinic*, 977 F. Supp. 1362, 1375–76 (W.D. Wis. 1997) (refusing to "presume the existence of any overall conspiracy that is not supported by the record" based on a prior jury verdict and Seventh Circuit decision finding the same defendant liable for a market-allocation conspiracy). A finding that two companies conspired nearly two decades ago, by a different mechanism and under different market conditions, cannot support an inference that the many Defendants here were conspiring during the timeframe alleged in the Complaints.

* * *

At bottom, Plaintiffs plead merely a conclusion, not a conspiracy. Despite drawing on the DOJ's complaint and Urner Barry's own files, they still cannot identify a single communication in which the Defendants they have sued agreed to the conspiracy they allege. They do not plead parallel conduct by those Defendants. Every plus factor they offer is either independent self-

interest, a feature of any commodity market, or a proceeding that involved settlements without any admission of liability and/or did not involve most Defendants. What remains is a theory too sprawling and self-contradictory to be plausible.

## II. INDIRECT PURCHASER PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED[10]

### A. All State-Law Claims Fail Without a Plausible Federal Antitrust Claim.

The Indirect Purchaser Plaintiffs' ("IPPs") state antitrust and consumer protection claims rest on the same alleged conduct as their federal claims, and fail for the same reasons. Both Commercial and Consumer IPPs sue under state antitrust laws that follow federal law, through harmonization statutes or by judicial interpretation. *See* Appendix B.[11] The state-law antitrust claims therefore fail on the same bases as the federal claims. *See, e.g.*, *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 847 (N.D. Ill. 2020).

IPPs' consumer protection claims fare no better. Because they rest on the same alleged conduct as the antitrust claims, they fail where, as here, the Complaints never explain why that conduct also supports a separate consumer protection claim. *See, e.g.*, *id.* at 847–48; Appendix B. These are antitrust claims relabeled as consumer protection claims, paired with a rote recitation of each statute's elements. If that sufficed, separate antitrust laws would be unnecessary. *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016) (affirming dismissal of "myriad state consumer protection and unfair trade statutes arising out of the same anticompetitive allegations underlying the antitrust claims [where plaintiffs'] briefing fails to explain adequately

---

[10] For the Court's convenience, Appendix A provides an overview of Defendants' state-specific arguments, and Appendices B through G chart each ground and the claims to which it applies.

[11] Both Commercial and Consumer IPPs cite Utah Code Annotated §§ 76-10-3101, *et seq.*, Comm. IPP Compl. ¶ 448; Consumer IPP Compl. Count 48, ¶¶ 780–85. That statute was recodified in 2025 as Utah Code Annotated §§ 76-16-5, *et seq*.

how the defendants' conduct violated any of the state consumer protection and unfair trade statutes in the conclusory list"). IPPs' consumer protection claims should be dismissed.

### B. IPPs' State-Law Claims Also Fail for Independent, State-Specific Reasons.

IPPs' state law claims also fail for a variety of independent, state-specific reasons.

#### 1. Consumer Protection Laws of Certain States Do Not Apply to Antitrust-Type Conduct.

The consumer protection laws of Arkansas, Colorado, Florida, Illinois, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, South Carolina, South Dakota, and West Virginia do not apply to antitrust-type claims. These statutes either enumerate the conduct that constitutes a violation without including antitrust violations, or otherwise foreclose claims premised solely on alleged anticompetitive conduct. Arkansas, for example, enumerates prohibited trade practices, and does not include price fixing or benchmark manipulation. *See, e.g.*, Ark. Code Ann. § 4-88-107. Courts have reached similar holdings under the consumer protection statutes of Colorado, Florida, Illinois, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, South Carolina, South Dakota, and West Virginia. *See* Appendix C.

#### 2. IPPs Fail to Satisfy Pre-Complaint Notice Requirements of Several States.

Certain state statutes require plaintiffs to notify the defendants or the state Attorney General before filing suit. *See* Appendix D. These pre-suit notice requirements are substantive, and noncompliance is fatal to the claim. *See, e.g.*, *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *14–15 (D. Mass. July 20, 2016) (dismissing Arizona, Hawaii, Nevada, and Utah claims because plaintiffs did not plead compliance with the pre-suit notice requirement). Commercial IPPs failed to provide the required notice to the state Attorneys General under the laws of Arizona, Colorado, Connecticut, Hawaii, Nevada, New York, Rhode Island, and Utah, and Consumer IPPs likewise

have not alleged compliance with the notice requirements of Arizona, Hawaii, Rhode Island, and Utah.[12]

Similarly, Massachusetts requires a written demand for relief be delivered to a prospective respondent before a complaint is filed. *See* Mass. Gen. Laws ch. 93A, § 9(3). Because Consumer IPPs do not allege that they ever made such a demand, their Chapter 93A claims should also be dismissed.

**3. Certain State Laws Bar IPPs from Pursuing Class Actions.**

IPPs' class claims under the antitrust laws of Illinois and Tennessee, and the consumer protection laws of Arkansas, Montana, and South Carolina, must be dismissed because each statute bars private class actions. *See* Arkansas: Ark. Code Ann. § 4-88-113(f)(1)(A)-(B) (barring private class actions unless the claim asserts a violation of Amendment 89 of the Arkansas Constitution, which neither Complaint alleges); Illinois: 740 Ill. Comp. Stat. 10/7(2) ("[N]o person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General"); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016) (dismissing indirect purchaser antitrust claims under Illinois law because only the Illinois Attorney General may bring them); Montana: Mont. Code § 30-14-133(1)(a) (a consumer "may bring an individual action but not a class action"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1103–04 (N.D. Cal. 2007) ("The [Montana] statutes cannot be enforced by way of a class action suit."); South Carolina: S.C. Code Ann. § 39-5-140 (a person "may bring an action individually, but not in a representative capacity, to recover actual damages"); Tennessee: Tenn. Code Ann.

12 Consumer IPPs must have been aware of these requirements, as they allege that they provided notice to the Oregon Attorney General, Consumer IPP Compl. ¶ 739, and Nevada Attorney General, *id.* ¶ 649, but list no other state Attorneys General.

§ 47-25-106(c) ("A class action lawsuit must not be brought to obtain injunctive relief and recover damages for conduct declared to be unlawful by this part.").

#### 4. Certain Consumer Protection Statutes Do Not Allow Claims Based on Commercial Transactions.

Commercial IPPs cannot bring consumer protection claims under the laws of Hawaii, Minnesota, Nevada, Rhode Island, South Carolina, Vermont, and West Virginia, because those statutes limit private actions to natural persons and/or to those who purchased goods "for personal, family, or household purposes." *See* Appendix E. Commercial IPPs' purchases are, by definition, not for "personal, family, or other household purposes." Indeed, their Complaint describes them as specifically for "business use." Comm. IPP Compl. ¶ 393. These claims should therefore be dismissed.

#### 5. Certain Consumer Protection Statutes Prohibit Recovery of Damages.

The consumer protection claims under the laws of California, Colorado, Minnesota, and North Dakota should be dismissed because those statutes permit only injunctive relief, and IPPs seek money damages. *See* California: Cal. Bus. & Prof. Code § 17203 ("Any person who engages, has engaged, or proposes to engage in unfair competition *may be enjoined* in any court of competent jurisdiction.") (emphasis added); *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003) ("A UCL action is equitable in nature; damages cannot be recovered."); Colorado: Colo. Rev. Stat. § 6-1-113(2); *In re Myford Touch Consumer Litig.*, 2016 WL 7734558, at *26 (N.D. Cal. Sept. 14, 2016) ("Colorado law prohibits class actions for monetary damages based on the Consumer Protection Act."); Minnesota: Minn. Stat. Ann. § 325D.45; *Dennis Simmons, D.D.S., P.A. v. Mod. Aero, Inc.*, 603 N.W.2d 336, 339 (Minn. Ct. App. 1999) (the DTPA "provides only injunctive relief, and because appellant pursued damages, not an injunction, he has not stated a claim for which relief could be granted"); North Dakota: *Trade 'N Post, L.L.C. v.*

*World Duty Free Americas, Inc.*, 628 N.W.2d 707, 716 (N.D. 2001) ("[T]here is no implied private right of action for damages under N.D.C.C. chs. 51-09 or 51-10.").

#### 6. IPPs Do Not Meet the Pleading Standards of the Florida and Michigan Statutes.

Because the Florida and Michigan statutory schemes sound in fraud, claims under them must satisfy Rule 9(b)'s heightened pleading standard, and IPPs' allegations do not. Courts dismiss such claims when they are not pleaded with the requisite particularity, and the Court should do so here too. *See* Florida: *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 665 (E.D. Mich. 2011) ("[N]othing relieves an indirect purchaser suing under the [FDUTPA] from the burden of pleading the claim with particularity."); Michigan: *id.* at 666 (dismissing MCPA claim for "failure to plead fraud with the requisite particularity [required by Rule 9(b)]"). Rule 9(b) requires a plaintiff to plead the "who, what, when, where, and how" of the alleged fraud, *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011), which may include "the time, place, and contents of any false representation, the identity of the party making the false statements and the consequences thereof." *U.S. ex rel. Lacy v. New Horizons, Inc.*, 348 F. App'x 421, 424 (10th Cir. 2009) (citation modified). IPPs' claims do not rest on false or misleading representations, and IPPs plainly have not pleaded fraud with particularity. They do not even allege when the alleged conspiracy was formed, who formed it, or its scope.

#### 7. *Illinois Brick* Bars IPPs' Antitrust Claims at Least in Part in Certain States.

Colorado and New Jersey enacted *Illinois Brick* repealer statutes during the alleged class period; thus, damages for purchases before those statutes took effect are barred. Colorado's repealer took effect June 7, 2023. *See* Colo. Rev. Stat. § 6-4-115(1); *see generally In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d at 724 ("It is well established … that statutes and their

amendments are presumed to apply prospectively" thus an "indirect purchaser antitrust claim is not saved by [a] later-enacted repealer statute.") (citation modified). Colorado law therefore bars IPPs' damages claims for purchases between January 1, 2022 (the beginning of the alleged class period), and June 6, 2023. New Jersey's repealer was enacted on August 5, 2022, and likewise bars damages for earlier purchases. N.J. Stat. § 56:9-12(a).

### C. Commercial IPPs' Unjust Enrichment Claims Fail as a Matter of State Law.

Commercial IPPs assert unjust enrichment claims, in the alternative, under the laws of 34 states and territories,[13] resting solely on the "unlawful conduct described above." Comm. IPP Compl., Count IV, ¶¶ 470–74. These claims should be dismissed in their entirety as insufficiently pleaded. *See* Appendix B. In addition, claims under certain states' laws fail because those states do not recognize unjust enrichment as a standalone cause of action, bar it where an adequate legal remedy exists, and/or require a direct benefit or special duty that Commercial IPPs have not pleaded.

#### 1. Commercial IPPs Fail to Plead an Unjust Enrichment Claim Under Any State's Law.

Commercial IPPs' unjust enrichment claims fail for the same reasons as their antitrust claims, as they are based on the same alleged conduct. Where an unjust enrichment claim is made in connection with alleged antitrust violations, it falls with the deficient Section 1 claim, because absent a viable underlying claim of illegality there can be no unjust enrichment. *See Ass'n Benefit Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("where the plaintiff's claim of unjust enrichment is predicated on the same allegations" as an independent fraud claim, "resolution

[13] Unjust enrichment claims are alleged under the laws of the following states and territories: Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well"); *see also Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) (Illinois law) ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim."); *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1200 (Ill. App. Ct. 2008) (noting unjust enrichment "is not a separate cause of action that, standing alone, would justify an action for recovery"); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 763 (E.D. Pa. 2014) ("[T]he vast majority of courts have held that indirect purchasers may not bring state claims for unjust enrichment if they otherwise would be barred from bringing a claim under that state's antitrust and consumer-protection statutes.").

Commercial IPPs' unjust enrichment claims also fail because they do not plead the elements under each state's law. "State law requirements under unjust enrichment law vary widely," and courts dismiss complaints that plead only "undifferentiated unjust enrichment claims," rather than pleading them on a state-by-state basis. *In re Packaged Ice*, 779 F. Supp. 2d at 667–68; *see In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d at 726 ("The bald assertion that the alleged antitrust conduct violates dozens of non-antitrust laws, or the implication that there are no consequential differences between those laws, is not entitled to deference."). Commercial IPPs' unjust enrichment claims are deficient as pled and should be dismissed.

**2. Unjust Enrichment Is Not a Standalone Basis for Relief in Certain States.**

Commercial IPPs' unjust enrichment claims under California, Mississippi, and New Hampshire law should be dismissed because those states recognize unjust enrichment only as a remedy, not a cause of action. *See* California: *Hill v. Roll Int'l Corp.*, 128 Cal. Rptr. 3d 109, 118 (Cal. Ct. App. 2011) ("Unjust enrichment is not a cause of action, just a restitution claim.");

Mississippi: *Cole v. Chevron USA, Inc.*, 554 F. Supp. 2d 655, 671 (S.D. Miss. 2007) ("Under Mississippi law, unjust enrichment is not an independent theory of recovery."); New Hampshire: *Gen. Insulation Co. v. Eckman Const.*, 992 A.2d 613, 621 (N.H. 2010) ("[U]njust enrichment generally does not form an independent basis for a cause of action.") (citation modified).

**3. Some States Bar Commercial IPPs' Unjust Enrichment Claims Where an Adequate Legal Remedy Exists.**

The laws of Arizona, California, Massachusetts, Minnesota, Montana, New Hampshire, South Dakota, Tennessee, and Utah bar Commercial IPPs' unjust enrichment claims because an adequate remedy at law is available for the same conduct. *See* Appendix F. IPPs have an adequate legal remedy even if their statutory claims are not ultimately viable. *See, e.g.*, *Dooner v. Yuen*, 2016 WL 6080814, at *3 (D. Minn. Oct. 17, 2016) ("[U]njust enrichment is an equitable claim that the Court may not consider where an adequate remedy at law is available. Since [the plaintiff's] breach-of-contract claim—although non-viable—provided her an adequate remedy at law, her unjust enrichment claim fails." (citing *Ventura v. Kyle*, 825 F.3d 876, 887 (8th Cir. 2016))); *VCS, Inc. v. Utah Cmty. Bank*, 293 P.3d 290, 300 (Utah 2012) (dismissing unjust enrichment claim even though plaintiff could not obtain relief under the statute on which it also sued, to avoid giving plaintiff "nearly the same remedy as the one it would have been entitled to"). Thus, regardless of whether the Court allows Commercial IPPs' antitrust or consumer protection claims under these states' laws to proceed, an adequate legal remedy exists, and their unjust enrichment claims under those laws should be dismissed.

**4. Commercial IPPs' Unjust Enrichment Claims Also Fail to Meet Pleading Standards in Specific States.**

Commercial IPPs' unjust enrichment claims fail under the laws of Arizona, Florida, Iowa, Maine, Massachusetts, Michigan, Missouri, North Carolina, North Dakota, Rhode Island, Utah, West Virginia, and Wisconsin because they do not plead that Defendants received a direct benefit,

as those states require. *See* Appendix G. By definition, *indirect* purchasers cannot confer a *direct* benefit on any Defendant, and courts consistently dismiss indirect purchasers' unjust enrichment claims in antitrust actions. *Id.* The Court should do the same here.

Furthermore, Commercial IPPs have not alleged any special duty owed, as required under the laws of Illinois and South Carolina. *See* Illinois: *Martis v. Grinnell Mut. Reins. Co.*, 905 N.E.2d 920, 928 (Ill. App. Ct. 2009) ("Absent an allegation that defendant was under a duty to plaintiff, plaintiff failed to state a cause of action for unjust enrichment."); South Carolina: *In re Microsoft Corp. Antitrust Litig.*, 401 F. Supp. 2d 461, 464–65 (D. Md. 2005) (dismissing unjust enrichment claim because "[u]nder South Carolina law … [a]s part of the [unjust enrichment] claim, the plaintiff must establish the existence of a duty owed to him or her by the defendant" and "South Carolina antitrust law cannot be read to create a duty owed by [a defendant] to indirect purchasers").

## **CONCLUSION**

Plaintiffs ask the Court to infer that nineteen Defendant families—a sprawling cross-section of the egg industry—conspired to inflate the prices of more than sixty egg products across six regional markets for several years, all through a hundred-year-old price index, precisely as a historic HPAI outbreak was devastating the industry's flocks. The Complaints do not support that inference. They plead no direct evidence of any conspiracy. They plead no parallel conduct by the Defendants they have named. And they plead no plus factors that distinguish their theory from the independent, self-interested responses of producers to a historic avian flu outbreak. Without any of these, Count I fails as to every Defendant. Because IPPs' state-law and unjust enrichment claims rest on the same alleged conduct, they fall with Count I; they also independently fail for the state-specific reasons set forth above. The moving Defendants therefore respectfully request that the Court dismiss the Complaints in their entirety with prejudice.

DATED: November 10, 2026

s/ Daniel E. Laytin
Daniel E. Laytin, P.C. (*pro hac vice*)
Christa C. Cottrell, P.C. (*pro hac vice*)
Taylor Rothman (*pro hac vice*)
Elisabeth C. Logan (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
333 W. Wolf Point Plaza
Chicago, IL 60654
Tel.: 312-862-2000
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com
taylor.rothman@kirkland.com
elisabeth.logan@kirkland.com

Olivia Adendorff, P.C. (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
4550 Travis Street
Dallas, TX 75205
Tel.: 214-972-1770
olivia.adendorff@kirkland.com

Ryan J. Walsh
Amy C. Miller
**EIMER STAHL LLP**
2 E. Mifflin Street, Ste. 703
Madison, WI 53703
Tel.: 608-620-8345
rwalsh@eimerstahl.com
amiller@eimerstahl.com

*Attorneys for Defendant Cal-Maine Foods, Inc.*

Kendall W. Harrison
Jenna L. Riddle
**GODFREY & KAHN, S.C.**
One East Main Street, Suite 500
Madison, WI 53703
Phone: (608) 257-3911
kharrison@gklaw.com
jriddle@gklaw.com

James A. King (*pro hac vice*)
Eleanor R. Tosti (*pro hac vice*)
Helen M. Fite (*pro hac vice*)

Respectfully submitted,

s/ Christopher E. Ondeck
Christopher E. Ondeck (*pro hac vice*)
Stephen R. Chuk (*pro hac vice*)
Jaclyn Phillips (*pro hac vice*)
Jared M. DuBosar (*pro hac vice*)
Rucha A. Desai (*pro hac vice*)
**PROSKAUER ROSE LLP**
1001 Pennsylvania Avenue NW, Suite 600
South
Washington, DC 20004
(202) 416-6800
condeck@proskauer.com
schuk@proskauer.com
jphillips@proskauer.com
jdubosar@proskauer.com
rdesai@proskauer.com

*Counsel for Defendants Daybreak Foods, Inc., Egg Clearinghouse, Inc., and ProEgg, Inc.*

s/ Wendy Arends
Wendy Arends
State Bar No.: 1090021
**HUSCH BLACKWELL LLP**
33 East Main Street, Suite 300
Madison, WI 53703
Tel.: (608) 258-7382
Fax: (608) 258-7138
wendy.arends@huschblackwell.com

Alicia L. Downey (*pro hac vice*)
**DOWNEY LAW LLC**
155 Federal Street, Suite 300
Boston, MA 02110
Tel.: (617) 444-9811
alicia@downeylawllc.com

*Counsel for Defendant Opal Foods LLC*

s/ Robin P. Sumner
Robin P. Sumner (*pro hac vice*)
Michael J. Hartman (*pro hac vice*)
Patrick DeSabato (*pro hac vice*)
Kaitlin Meola (*pro hac vice*)

**PORTER, WRIGHT, MORRIS & ARTHUR LLP**
41 South High Street, Suite 2900
Columbus, OH 43215
Tel. 614-227-2000
jking@porterwright.com
etosti@porterwright.com
hfite@porterwright.com

Jay L. Levine (*pro hac vice*)
**PORTER, WRIGHT, MORRIS & ARTHUR LLP**
2020 K Street, N.W., Suite 600
Washington, DC 20006
Tel. 202-778-3021
jlevine@porterwright.com

*Counsel for Defendant Rose Acre Farms, Inc.*

*s/ Michael D. Bonanno*
Michael D. Bonanno (*pro hac vice*)
Catie Ventura (*pro hac vice*)
Ryan Andrews (*pro hac vice*)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
555 13th Street NW, Suite 600
Washington, DC 20004
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
mikebonanno@quinnemanuel.com
catieventura@quinnemanuel.com
ryanandrews@quinnemanuel.com

*Attorneys for Hickman's Egg Ranch, Inc.*

*/s/ Ausra O. Deluard*
Ausra O. Deluard
**AURIAN P.C.**
1 Sansome St. Suite 1400 (10055)
San Francisco, CA 94104
Tel. 415.891.0940
ausra@aurianlaw.com

Patrick F. Linehan
Matthew James Galvin
Mario H. Nguyen

**TROUTMAN PEPPER LOCKE LLP**
3000 Two Logan Square, 18th & Arch Streets
Philadelphia, PA 19103
Tel.: 215-981-4000
robin.sumner@troutman.com
michael.hartman@troutman.com
patrick.desabato@troutman.com
kaitlin.meola@troutman.com

Kendall W. Harrison
Jenna L. Riddle
**GODFREY & KAHN, S.C.**
One East Main Street, Suite 500
Madison, WI 53703
Phone: (608) 257-3911
kharrison@gklaw.com
jriddle@gklaw.com

*Attorneys for Defendants Versova Holdings, LLC, Versova Management Cooperative, Centrum Valley Holdings, LLC, and Oakdell Farms, LLC*

*s/ Gwendolyn J. Lindsay Cooley*
Gwendolyn J. Lindsay Cooley
WI State Bar No. 1053856
**Lindsay Cooley Law**
PO Box 105
Mount Horeb, WI 53572
(608) 909-6886
gwendolyn@lindsaycooley.com

*Counsel for Defendant Weaver Eggs*

*s/ Bradley A. Chapin*
Bradley A. Chapin (*pro hac vice*)
Lucas K. Hori (*pro hac vice*)
Joseph A. D'Antonio (*pro hac vice*)
**RUTAN & TUCKER, LLP**
18575 Jamboree Road, 9th Floor
Irvine, CA 92612
Tel: 714-641-5100
bchapin@rutan.com
jdantonio@rutan.com
lhori@rutan.com

**STEPTOE LLP**
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel: (718) 290-3534
plinehan@steptoe.com
mgalvin@steptoe.com
mnnguyen@steptoe.com

Dean A. Strang
Wisconsin Bar No. 1009868
R. Rick Resch
Wisconsin Bar No. 1117722
**STRANG BRADLEY, LLC**
613 Williamson St., Suite 204
Madison, WI 53703
(608) 535-1550
Dean@StrangBradley.com
Rick@StrangBradley.com

*Attorneys for Defendants Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, LLC, Hillandale Farms, Inc., Hillandale Farms East, Inc., Hillandale Farms Corporation, and Pearl Valley Farms, Inc.*

*s/ Kendall W. Harrison*
Kendall W. Harrison
Jenna L. Riddle
**GODFREY & KAHN, S.C.**
One East Main Street, Suite 500
Madison, WI 53703
Phone: (608) 257-3911
kharrison@gklaw.com
jriddle@gklaw.com

*Attorneys for Defendant Noah W. Kreider & Sons, LLC*

*s/ Monica A. Mark*
Laura A. Brenner
WI State Bar ID No. 1001857
lbrenner@reinhartlaw.com
Jessica Hutson Polakowski
WI State Bar ID No. 1061368
jpolakowski@reinhartlaw.com
Monica A. Mark

Richard L. Bolton
Boardman & Clark LLP
1 S. Pinckney Street, Suite 410
Madison, WI 53701
608-257-9521
rbolton@boardmanclark.com

*Attorneys for Luberski, Inc. d/b/a Hidden Villa Ranch*

*s/ Kathy Osborn*
Kathy Osborn (*pro hac vice*)
Susanne A. Johnson (*pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
300 N. Meridian Street, Ste. 2500
Indianapolis, IN 46204
(317) 237-0300
kathy.osborn@faegredrinker.com
susanne.johnson@faegredrinker.com

Michael D. Leffel (WI Bar No. 1032238)
Andrew C. Gresik (WI Bar No. 1104650)
**Foley & Lardner LLP**
150 E. Gilman St., Ste. 5000
Madison, WI 53703
(608) 257-5035
mleffel@foley.com
agresik@foley.com

*Attorneys for Defendant Midwest Poultry Services, L.P., d/b/a MPS Egg Farms*

*s/ Jennifer A.L. Battle*
Jennifer A.L. Battle (admitted *pro hac vice*)
Theodore M. Munsell (admitted *pro hac vice)*
Jill Rogers Spiker (admitted *pro hac vice*)
Joel E. Sechler (admitted *pro hac vice*)
**CARPENTER LIPPS LLP**
280 North High Street Suite 1300
Columbus, OH 43215
(614) 365-4100
Battle@carpenterlipps.com
Munsell@carpenterlipps.com
Spiker@carpenterlipps.com
Sechler@carpenterlipps.com

WI State Bar ID No. 1082428
mmark@reinhartlaw.com
Sadie C. Hobbs
WI State Bar ID No. 1125885
shobbs@reinhartlaw.com
**Reinhart Boerner Van Deuren s.c.**
1000 North Water Street, Suite 1700
Milwaukee, WI 53202
Telephone: 414-298-1000
Facsimile: 414-298-8097

*Attorneys for Prairie Star Farms, LLC, Defendant*

David M. Pelletier, SBN: 1072343
Zachariah J. Sibley, SBN: 1116323
**AXLEY LLP**
2 East Mifflin Street, Suite 200 (53703)
P.O. Box 1767
Madison, WI 53701-1767
(608) 257-5661 (office)
(608) 257-5444 (facsimile)
dpelletier@axley.com
zsibley@axley.com

*Attorneys for Defendant Cooper Farms, Inc.*

*s/ Troy J. Hutchinson, PLLP*
Troy J. Hutchinson (#0320420)
**ROCK HUTCHINSON, PLLP**
120 South 6th Street, Suite 2480
Minneapolis, MN 55402
P: 612-573-3688
Direct: 612-743-3164
thutchinson@rockhutchinson.com

*Counsel for Sparboe Farms, Inc.*

| **Appendix A**<br>**Summary of States and Claims Subject to Dismissal, Organized by Section** | |
|---|---|
| **Argument** | **States and Claims Subject to Dismissal** |
| **II.A. All State-Law Claims Fail Without a Plausible Federal Antitrust Claim** | **All states and Puerto Rico:**<br>Commercial IPP Compl.: Count II, ¶¶ 414–51 (Antitrust); Count III, ¶¶ 452–69 (Cons. Prot.)<br>Consumer IPP Compl.: Counts 2–52, ¶¶ 452–815 (Antitrust; Cons. Prot.) |
| **II.B.1. Consumer Protection Laws of Certain States Do Not Apply to Antitrust-Type Conduct** | **Arkansas:** Commercial IPP Compl.: ¶ 456 (Cons. Prot.); Consumer IPP Compl.: Count 3, ¶¶ 458–67 (Cons. Prot.)<br>**Colorado:** Consumer IPP Compl.: Count 7, ¶¶ 498–505 (Cons. Prot.)<br>**Florida:** Commercial IPP Compl.: ¶ 458 (Cons. Prot.); Consumer IPP Compl.: Count 11, ¶¶ 532–41 (Cons. Prot.)<br>**Illinois:** Commercial IPP Compl.: ¶ 460 (Cons. Prot.); Consumer IPP Compl.: Count 14, ¶¶ 556–64 (Cons. Prot.)<br>**Michigan:** Consumer IPP Compl.: Count 21, ¶¶ 600–603 (Cons. Prot.)<br>**Minnesota:** Commercial IPP Compl.: ¶ 461 (Cons. Prot.); Consumer IPP Compl.: Count 23, ¶¶ 610–14 (Cons. Prot.)<br>**Nevada:** Commercial IPP Compl.: ¶ 463 (Cons. Prot.); Consumer IPP Compl.: Count 30, ¶¶ 650–55 (Cons. Prot.)<br>**New Jersey:** Consumer IPP Compl.: Count 34, ¶¶ 677–80 (Cons. Prot.)<br>**New Mexico:** Commercial IPP Compl.: ¶ 464 (Cons. Prot.); Consumer IPP Compl.: Count 36, ¶¶ 687–97 (Cons. Prot.)<br>**Oregon:** Consumer IPP Compl.: Count 41, ¶¶ 729–39 (Cons. Prot.)<br>**Rhode Island:** Commercial IPP Compl.: ¶ 466 (Cons. Prot.); Consumer IPP Compl.: Count 44, ¶¶ 751–56 (Cons. Prot.)<br>**South Carolina:** Commercial IPP Compl.: ¶ 467 (Cons. Prot.)<br>**South Dakota:** Consumer IPP Compl.: Count 46, ¶¶ 763–73 (Cons. Prot.)<br>**West Virginia:** Commercial IPP Compl.: ¶ 469 (Cons. Prot.) |
| **II.B.2 IPPs Fail to Satisfy Pre-Complaint Notice Requirements of Several States** | **Arizona:** Commercial IPP Compl.: ¶ 420 (Antitrust); Consumer IPP Compl.: Count 2, ¶¶ 452–57 (Antitrust)<br>**Colorado:** Commercial IPP Compl.: ¶ 422 (Antitrust)<br>**Connecticut:** Commercial IPP Compl.: ¶ 423 (Antitrust); Consumer IPP Compl.: Count 8, ¶¶ 506–14 (Antitrust and Cons. Prot.)<br>**Hawaii:** Commercial IPP Compl.: ¶ 426 (Antitrust); Consumer IPP Compl.: Count 12, ¶¶ 542–47 (Antitrust)<br>**Nevada:** Commercial IPP Compl.: ¶ 436 (Antitrust)<br>**New York:** Commercial IPP Compl.: ¶ 440 (Antitrust)<br>**Rhode Island:** Commercial IPP Compl.: ¶ 445 (Antitrust); Consumer IPP Compl.: Count 43, ¶¶ 745–50 (Antitrust)<br>**Utah:** Commercial IPP Compl.: ¶ 448 (Antitrust); Consumer IPP Compl.: Count 48, ¶¶ 780–85 (Antitrust) |

| | |
|---|---|
| **II.B.3. Certain State Laws Bar IPPs from Pursuing Class Actions** | **Arkansas:** Commercial IPP Compl.: ¶ 456 (Cons. Prot.); Consumer IPP Compl.: Count 3, ¶¶ 458–67 (Cons. Prot.)<br>**Illinois:** Commercial IPP Compl.: ¶ 427 (Antitrust); Consumer IPP Compl.: Count 13, ¶¶ 548–55 (Antitrust)<br>**Montana:** Consumer IPP Compl.: Count 26, ¶¶ 628–32 (Cons. Prot.)<br>**South Carolina:** Commercial IPP Compl.: ¶ 467 (Cons. Prot.)<br>**Tennessee:** Commercial IPP Compl.: ¶ 447 (Antitrust); Consumer IPP Compl.: Count 47, ¶¶ 774–79 (Antitrust) |
| **II.B.4. Certain Consumer Protection Statutes Do Not Allow Claims Based on Commercial Transactions** | **Hawaii:** Commercial IPP Compl.: ¶ 459 (Cons. Prot.); Consumer IPP Compl.: N/A<br>**Minnesota:** Commercial IPP Compl.: ¶ 461 (Cons. Prot.); Consumer IPP Compl.: N/A<br>**Nevada:** Commercial IPP Compl.: ¶ 463 (Cons. Prot.); Consumer IPP Compl.: N/A<br>**Rhode Island:** Commercial IPP Compl.: ¶ 466 (Cons. Prot.); Consumer IPP Compl.: N/A<br>**South Carolina:** Commercial IPP Compl.: ¶ 467 (Cons. Prot.); Consumer IPP Compl.: N/A<br>**Vermont:** Commercial IPP Compl.: ¶ 468 (Cons. Prot.); Consumer IPP Compl.: N/A<br>**West Virginia:** Commercial IPP Compl.: ¶ 469 (Cons. Prot.); Consumer IPP Compl.: N/A |
| **II.B.5. Certain Consumer Protection Statutes Prohibit Recovery of Damages** | **California:** Commercial IPP Compl.: ¶ 457 (Cons. Prot.); Consumer IPP Compl.: Count 5, ¶¶ 480–89 (Cons. Prot.)<br>**Colorado:** Consumer IPP Compl.: Count 7, ¶¶ 498–505 (Cons. Prot.)<br>**Minnesota:** Commercial IPP Compl.: ¶ 461 (Cons. Prot.); Consumer IPP Compl.: Count 23, ¶¶ 610–14 (Cons. Prot.)<br>**North Dakota:** Consumer IPP Compl.: Count 39, ¶¶ 722–23 (Cons. Prot.) |
| **II.B.6. IPPs Do Not Meet the Pleading Standards of the Florida and Michigan Statutes** | **Florida (Rule 9(b)):** Commercial IPP Compl.: ¶ 458 (Cons. Prot.); Consumer IPP Compl.: Count 11, ¶¶ 532–41 (Cons. Prot.)<br>**Michigan (Rule 9(b)):** Consumer IPP Compl.: Count 21, ¶¶ 600–603 (Cons. Prot.) |
| **II.B.7. Illinois Brick Bars Indirect Purchaser Plaintiffs' Antitrust Claims At Least In Part In Certain States** | **Colorado:** Commercial IPP Compl.: ¶ 422 (Antitrust); Consumer IPP Compl.: Count 6, ¶¶ 490–97 (Antitrust)<br>**New Jersey:** Commercial IPP Compl.: ¶ 438 (Antitrust); Consumer IPP Compl.: Count 33, ¶¶ 672–76 (Antitrust) |
| **II.C.1. Commercial IPPs Fail to Plead an Unjust Enrichment Claim Under Any State's Law** | **All 34 states and territories listed in Comm. IPP Compl. n.11 (Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin):** Commercial IPP Compl.: Count IV, ¶¶ 470–74 & n.11 (Unjust Enrichment) |

| | |
|---|---|
| **II.C.2. Unjust Enrichment Is Not a Standalone Basis for Relief in Certain States** | **California, Mississippi, New Hampshire:** Commercial IPP Compl.: Count IV, ¶¶ 470–74 (Unjust Enrichment) |
| **II.C.3. Some States Bar Commercial IPPs' Unjust Enrichment Claims Where an Adequate Legal Remedy Exists** | **Arizona, California, Massachusetts, Minnesota, Montana, New Hampshire, South Dakota, Tennessee, Utah:** Commercial IPP Compl.: Count IV, ¶¶ 470–74 (Unjust Enrichment) |
| **II.C.4. Commercial IPPs' Unjust Enrichment Claims Also Fail to Meet Pleading Standards in Specific States** | **Arizona (direct benefit), Florida (direct benefit), Illinois (special duty), Iowa (direct benefit), Maine (direct benefit), Massachusetts (direct benefit), Michigan (direct benefit), Missouri (direct benefit), North Carolina (direct benefit), North Dakota (direct benefit), Rhode Island (direct benefit), South Carolina (special duty), Utah (direct benefit), West Virginia (direct benefit), Wisconsin (direct benefit):** Commercial IPP Compl.: Count IV, ¶¶ 470–74 (Unjust Enrichment) |

**Appendix B**

**Sec. II.A: All State-Law Claims Fail Without a Plausible Federal Antitrust Claim.**

| State | Supporting Caselaw |
|---|---|
| **Arizona**<br><br>Commercial IPP Compl.: ¶ 420 (Antitrust)<br><br>Consumer IPP Compl.: Count 2, ¶¶ 452–457 (Antitrust) | • *Tee Time Arrangers, Inc. v. Vistoso Gold Partners, LLC*, No. 1 CA-CV 07-0268, 2008 WL 4149295, at *5 (Ariz. Ct. App. Feb. 28, 2008) ("The Arizona Legislature has created a statutory scheme designed to strive for uniformity between federal and state antitrust laws."). |
| **Arkansas**<br><br>Commercial IPP Compl.: ¶ 456 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 3, ¶¶ 458–467 (Cons. Prot.) | • *Robinson v. HP, Inc.*, 2025 WL 2802077, at *16 (N.D. Ill. Sept. 30, 2025) (dismissing state consumer protection claims predicated on anticompetitive conduct "for the same reasons as the federal antitrust claims"); *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 847–48 (N.D. Ill. 2007). |
| **California**<br><br>Commercial IPP Compl.: ¶ 421 (Antitrust); ¶ 457 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 4, ¶¶ 468–479 (Antitrust); Count 5, ¶¶ 480–489 (Cons. Prot.) | • *Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, 729 F. App'x 528, 531 (9th Cir. 2018) (failure under the Sherman Act "necessarily implies that the conduct is not unlawful under the Cartwright Act").<br>• *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **Colorado**<br><br>Commercial IPP Compl.: ¶ 422 (Antitrust)<br><br>Consumer IPP Compl.: Count 6, ¶¶ 490–497 (Antitrust); Count 7, ¶¶ 498–505 (Cons. Prot.) | • *OmniMax Int'l, Inc. v. Anlin Indus., Inc.*, No. 18-cv-01830-DDD-MEH, 2019 WL 2516121, at *4 (D. Colo. June 17, 2019) ("[S]tating a claim under the [Colorado Antitrust] Act is analogous to one brought under the federal Sherman Act. . .").<br>• *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |

| | |
|---|---|
| **Connecticut**<br><br><u>Commercial IPP Compl.</u>: ¶ 423 (Antitrust)<br><br><u>Consumer IPP Compl.</u>: Count 8, ¶¶ 506–514 (Antitrust and Cons. Prot.) | • *Dichello Distribs., Inc. v. Anheuser-Busch, LLC*, No. 3:20-cv-01003 (MPS), 2021 WL 4170681, at *6 (D. Conn. Sept. 14, 2021) ("Connecticut courts follow 'federal precedent' when interpreting the Connecticut Antitrust Act") (citation modified).<br>• *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–848. |
| **Delaware**<br><br><u>Commercial IPP Compl.</u>: ¶ 424 (Antitrust) | • Del. Code Ann. tit. 6, § 2113 ("This chapter shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes.")<br>• *Drabbant Enters., Inc. v. Great Atl. & Pac. Tea Co.*, 688 F. Supp. 1567, 1571 n.1 (D. Del. 1988) ("The Delaware Antitrust Act requires that the state law be construed in harmony with the interpretation of the federal antitrust law"). |
| **District of Columbia**<br><br><u>Commercial IPP Compl.</u>: ¶ 425 (Antitrust)<br><br><u>Consumer IPP Compl.</u>: Count 9, ¶¶ 515-521 (Antitrust); Count 10, ¶¶ 522–31 (Cons. Prot.) | • D.C. Code § 28-4515 ("A court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes.").<br>• *Atl. Coast Airlines Holdings, Inc. v. Mesa Air Grp., Inc.*, 295 F. Supp. 2d 75, 87 (D.C. 2003) ("[T]he District of Columbia Antitrust Act at D.C. Code § 28-4502…parallels § 1 of the Sherman Act.").<br>• *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **Florida**<br><br><u>Commercial IPP Compl.</u>: ¶ 458 (Cons. Prot.)<br><br><u>Consumer IPP Compl.</u>: Count 11, ¶¶ 532–41 (Cons. Prot.) | • *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **Hawaii**<br><br><u>Commercial IPP Compl.</u>: ¶ 426 (Antitrust); ¶ 459 (Cons. Prot.)<br><br><u>Consumer IPP Compl.</u>: Count 12, ¶¶ 542–47 (Antitrust) | • Haw. Rev. Stat. § 480-3 ("This chapter shall be construed in accordance with judicial interpretations of similar federal antitrust statutes, except that lawsuits by indirect purchasers may be brought as provided in this chapter.").<br>• *Courbat v. Dahana Ranch, Inc.*, 141 P.3d 427, 435 (Haw. 2006) (HRS ch. 480 "shall be construed in accordance with judicial interpretations of similar federal antitrust statutes") (citation modified).<br>• *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |

| | |
|---|---|
| **Illinois**<br><br>Commercial IPP Compl.: ¶ 427 (Antitrust); ¶ 460 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 13, ¶¶ 548–55 (Antitrust); Count 14, ¶¶ 556–64 (Cons. Prot.) | • 740 Ill. Comp. Stat. 10/11 ("[T]he courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act.").<br>• *Gutnayer v. Cendant Corp.*, 116 F. App'x 758, 761 (7th Cir. 2004) ("The Illinois Antitrust Act is modeled on the Sherman Act, and Illinois courts interpret the state antitrust act in accordance with federal law.").<br>• *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **Iowa**<br><br>Commercial IPP Compl.: ¶ 428 (Antitrust)<br><br>Consumer IPP Compl.: Count 15, ¶¶ 565–69 (Antitrust) | • Iowa Code § 553.2 ("This chapter shall … be made to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices.").<br>• *Mueller v. Wellmark, Inc.*, 861 N.W.2d 563, 567 (Iowa 2015) ("[W]hen interpreting the Iowa Competition Law, we have generally adhered to federal interpretations of federal antitrust law."). |
| **Kansas**<br><br>Commercial IPP Compl.: ¶ 429 (Antitrust)<br><br>Consumer IPP Compl.: Count 16, ¶¶ 570–76 (Antitrust) | • Kan. Stat. Ann. § 50-163(b) ("[T]he Kansas restraint of trade act shall be construed in harmony with ruling judicial interpretations of federal antitrust law by the United States supreme court.").<br>• *Digital Ally, Inc. v. Taser Int'l, Inc.*, 2017 WL 131595, at *2 (D. Kan. Jan. 12, 2017), *aff'd*, 720 F. App'x 1023 (Fed. Cir. 2018). |
| **Maine**<br><br>Commercial IPP Compl.: ¶ 430 (Antitrust)<br><br>Consumer IPP Compl.: Count 17 ¶¶ 577–82 (Antitrust) | • *Davric Me. Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000) (Maine antitrust claims are analyzed "according to the doctrines developed in relation to federal law"). |
| **Maryland**<br><br>Commercial IPP Compl.: ¶ 431 (Antitrust) | • Md. Code Ann., Com. Law § 11-202(a)(2) ("It is the intent of the General Assembly that, in construing [the Antitrust Act], the courts be guided by the interpretation given by the federal courts to the various federal statutes").<br>• *Krause Marine Towing Corp. v. Ass'n of Md. Pilots*, 44 A.3d 1043, 1053 (Md. Ct. Spec. App. 2012) (Maryland's Antitrust Act "is essentially the same as § 1 of the Sherman Antitrust Act"). |

| | |
|---|---|
| Consumer IPP Compl.: Count 18, ¶¶ 583–87 (Antitrust) | |
| **Massachusetts**<br><br>Consumer IPP Compl.: Count 19, ¶¶ 588–94 (Cons. Prot.) | • Mass. Gen. Laws. Ann. ch. 93, § 1 (“This chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes”).<br>• *Action Ambulance Serv., Inc. v. Atlanticare Health Servs., Inc.*, 815 F. Supp. 33, 38 (D. Mass. 1993) (Massachusetts Antitrust Act is “construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable”). |
| **Michigan**<br><br>Commercial IPP Compl.: ¶ 432 (Antitrust)<br><br>Consumer IPP Compl.: Count 20, ¶¶ 595–99 (Antitrust); Count 21, ¶¶ 600–03 (Cons. Prot.) | • Mich. Comp. Laws § 445.784(1) (“To the extent that this act incorporates provisions of or provisions similar to the uniform state antitrust act, this act shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this act among those states that enact similar provisions.”).<br>• Mich. Comp. Laws § 445.784(2) (“the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes”).<br>• *Little Caesar Enters., Inc. v. Smith*, 895 F. Supp. 884, 898 (E.D. Mich. 1995) (“Michigan antitrust law is identical to federal law and follows the federal precedents”).<br>• *Hobart-Mayfield, Inc. v. National Operating Committee on Standards for Athletic Equipment,* 48 F.4th 656, 663 (6th Cir. 2022) (“Mayfield’s Michigan Antitrust Reform Act claims prevail or fail in tandem with its Sherman Act claims.”).<br>• *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **Minnesota**<br><br>Commercial IPP Compl.: ¶ 433 (Antitrust); ¶ 461 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 22, ¶¶ 604–09 (Antitrust); Count 23, ¶¶ 610–14 (Cons. Prot.) | • *Lamminem v. City of Cloquet*, 987 F. Supp. 723, 734 (D. Minn. 1997) (“Minnesota anti-trust law is interpreted consistent with the federal court’s construction of the Sherman Act.”).<br>• *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **Mississippi**<br><br>Commercial IPP Compl.: ¶ 434 (Antitrust) | • *Futurevision Cable Sys., Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 780 (S.D. Miss. 1992) (dismissing state law allegations *because* the court dismissed federal antitrust claims); *see also Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1070 n.5 (5th Cir. 1984) (treating state and federal antitrust claims as “analytically identical”))). |

| | |
|---|---|
| <u>Consumer IPP Compl.</u>: Count 24, ¶¶ 615–21 (Antitrust) | |
| **Missouri**<br><br><u>Consumer IPP Compl.</u>: Count 25, ¶¶ 622–27 (Cons. Prot.) | • *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **Montana**<br><br><u>Consumer IPP Compl.</u>: Count 26, ¶¶ 628–32 (Cons. Prot.) | • *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **Nebraska**<br><br><u>Commercial IPP Compl.</u>: ¶ 435 (Antitrust); ¶ 462 (Cons. Prot.)<br><br><u>Consumer IPP Compl.</u>: Count 27, ¶¶ 633–38 (Antitrust); Count 28, ¶¶ 639–43 (Cons. Prot.) | • Neb. Rev. Stat. § 59-829 ("When any provision of sections 59-801 to 59-831 and sections 84-211 to 84-214 or any provision of Chapter 59 is the same as or similar to the language of a federal antitrust law, the courts of this state in construing such sections or chapter shall follow the construction given to the federal law by the federal courts.").<br>• *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 297 (Neb. 2006) (Junkin Act requires courts to "follow the construction given to the federal law by the federal courts" (quoting Neb. Rev. Stat. § 59-829)).<br>• *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **Nevada**<br><br><u>Commercial IPP Compl.</u>: ¶ 436 (Antitrust); ¶ 463 (Cons. Prot.)<br><br><u>Consumer IPP Compl.</u>: Count 29, ¶¶ 644–49 (Antitrust); Count 30, ¶¶<br><br>650–55 (Cons. Prot.) | • Nev. Rev. Stat. § 598A.050 ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes.").<br>• *Nev. Recycling & Salvage, Ltd. v. Reno Disposal Co., Inc.*, 423 P.3d 605, 607 (Nev. 2018) ("The UTPA 'shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes.'" (quoting Nev. Rev. Stat. § 598A.050)).<br>• *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **New Hampshire**<br><br><u>Commercial IPP Compl.</u>: ¶ 437 (Antitrust)<br><br><u>Consumer IPP Compl.</u>: Count 31, ¶¶ 656–60 | • N.H. Rev. Stat. Ann. § 356:14 ("In any action or prosecution under this chapter, the courts may be guided by interpretations of the United States' antitrust laws.").<br>• *Minuteman, LLC v. Microsoft Corp.*, 795 A.2d 833, 836 (N.H. 2002) ("By including RSA 356:14 in the statute, the legislature expressly encouraged a uniform construction with federal antitrust law."). |

| | |
|---|---|
| (Antitrust); Count 32, ¶¶ 661–71 (Cons. Prot.) | • *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **New Jersey**<br><br><u>Commercial IPP Compl.</u>: ¶ 438 (Antitrust)<br><br><u>Consumer IPP Compl.</u>: Count 33, ¶¶ 672–76 (Antitrust); Count 34, ¶¶ 677–80 (Cons. Prot.) | • N.J. Stat. Ann. § 56:9-18 ("This act shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it.").<br>• *Sickles v. Cabot Corp.*, 877 A.2d 267, 270–71 (N.J. Super. Ct. App. Div. 2005) ("We follow federal antitrust law in interpreting our own antitrust statute.").<br>• *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **New Mexico**<br><br><u>Commercial IPP Compl.</u>: ¶ 439 (Antitrust); ¶ 464 (Cons. Prot.)<br><br><u>Consumer IPP Compl.</u>: Count 35, ¶¶ 681–86 (Antitrust); Count 36, ¶¶ 687–97 (Cons. Prot.) | • N.M. Stat. Ann. § 57-1-15 ("Unless otherwise provided in the Antitrust Act, the Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws. This construction shall be made to achieve uniform application of the state and federal laws prohibiting restraints of trade and monopolistic practices.").<br>• *Romero v. Philip Morris Inc.*, 242 P.3d 280, 291 (N.M. 2010) (courts must ensure state antitrust law "does not deviate substantially from federal interpretations of antitrust law").<br>• *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **New York**<br><br><u>Commercial IPP Compl.</u>: ¶ 440 (Antitrust)<br><br><u>Consumer IPP Compl.</u>: Count 37, ¶¶ 698–702 (Antitrust) | • *Anheuser-Busch, Inc. v. Abrams*, 520 N.E.2d 535, 539 (N.Y. 1988) ("[T]he Donnelly Act – often called a 'Little Sherman Act' – should generally be construed in light of federal precedent…"). |
| **North Carolina**<br><br><u>Commercial IPP Compl.</u>: ¶ 441 (Antitrust); ¶ 465 (Cons. Prot.)<br><br><u>Consumer IPP Compl.</u>: Count 38, ¶¶ 703–709 (Cons. Prot.) | • *Window World of Baton Rouge, LLC v. Window World, Inc.*, No. 15 CVS 1, 2016 WL 6242945, at *5 (N.C. Super. Oct. 25, 2016) ("[F]ederal decisions are instructive in interpreting [N.C. Gen. Stat. § 75-1] . . . .").<br>• *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **North Dakota** | • *In re Namenda Indirect Purchaser Antitrust Litig.,* 338 F.R.D. 527, 572 (S.D.N.Y. 2021) (elements of a monopolization or restraint-of-trade claim "are effectively the same under the state and federal laws"). |

| | |
|---|---|
| Commercial IPP Compl.: ¶ 442 (Antitrust)<br><br>Consumer IPP Compl.: Count 39, ¶¶ 710–23 (Antitrust and Cons. Prot.) | • *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **Oregon**<br><br>Commercial IPP Compl.: ¶ 443 (Antitrust)<br><br>Consumer IPP Compl.: Count 40, ¶¶ 724–28 (Antitrust); Count 41, ¶¶ 729–39 (Cons. Prot.) | • Or. Rev. Stat. § 646.715(2) ("The decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority in the construction of ORS 646.705 to 646.805 and 646.990.").<br>• *Or. Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 n.4 (9th Cir. 1999) ("The Oregon antitrust statutes are almost identical to the federal antitrust statutes.").<br>• *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **Puerto Rico**<br><br>Commercial IPP Compl.: ¶ 444 (Antitrust)<br><br>Consumer IPP Compl.: Count 42, ¶¶ 740-44 (Antitrust) | • *Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.*, 332 F.3d 6, 16 (1st Cir. 2003) (Puerto Rico's antitrust law "mirrors the language of Section 1 of the Sherman Act," and "we have treated the two provisions as coextensive"). |
| **Rhode Island**<br><br>Commercial IPP Compl.: ¶ 445 (Antitrust); ¶ 466 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 43, ¶¶ 745–50 (Antitrust); Count 44, ¶¶ 751–56 (Cons. Prot.) | • R.I. Gen. Laws § 6-36-2(b) ("This chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed.").<br>• *ERI Max Ent., Inc. v. Streisand*, 690 A.2d 1351, 1353 n.1 (R.I. 1997) ("[F]ederal cases interpreting parallel federal provisions are appropriately consulted in interpreting state antitrust laws.").<br>• *Robinson*, 2025 WL 2802077, at *16; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **South Carolina**<br><br>Commercial IPP Compl.: | • *Clark v. Flow Measurement, Inc.*, 948 F. Supp. 519, 529 (D.S.C. 1996) ("[P]laintiffs' SCUTPA claim rises and falls with their antitrust claim."). |

| | |
|---|---|
| ¶ 467 (Cons. Prot.) | |
| **South Dakota**<br><br>Commercial IPP Compl.: ¶ 446 (Antitrust)<br><br>Consumer IPP Compl.: Count 45, ¶¶ 757–62 (Antitrust); Count 46, ¶¶ 763–73 (Cons. Prot.) | • S.D. Codified Laws § 37-1-22 ("It is the intent of the Legislature that in construing this chapter, the courts may use as a guide interpretations given by the federal or state courts to comparable antitrust statutes.").<br>• *Byre v. City of Chamberlain*, 362 N.W.2d 69, 73–74 (S.D. 1985) ("[G]reat weight should be given to the federal cases interpreting the federal statute.").<br>• *Robinson*, 2025 WL 2802077, at *16; *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847–48. |
| **Tennessee**<br><br>Commercial IPP Compl.: ¶ 447 (Antitrust)<br><br>Consumer IPP Compl.: Count 47, ¶¶ 774–79 (Antitrust) | • *Bailey's, Inc. v. Windsor Am., Inc.*, 948 F.2d 1018, 1032 (6th Cir. 1991) (approving rejection of Tennessee antitrust claims for the same reasons as the federal claims). |
| **Utah**<br><br>Commercial IPP Compl.: ¶ 448 (Antitrust)<br><br>Consumer IPP Compl.: Count 48, ¶ 780–85 (Antitrust) | • *Diaz v. Farley*, 15 F. Supp. 2d 1138, 1150 (D. Utah 1998) ("The Utah Antitrust claims are also dismissed for the same reasons because the Utah Antitrust statute follows the same analysis as the federal statute.").<br>• Utah Code Ann. § 76-10-3118 ("The Legislature intends that the courts, in construing this act, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes."). |
| **Vermont**<br><br>Commercial IPP Compl.: ¶ 449 (Antitrust); ¶ 468 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 49, ¶¶ 786–91 (Cons. Prot.) | • 9 V.S.A § 2451 (chapter intended "to complement the enforcement of federal statutes and decisions governing . . . anti-competitive practices").<br>• 9 V.S.A § 2453(b) (courts "will be guided by the construction of similar terms contained in Section 5(a)(1) of the Federal Trade Commission Act").<br>• 9 V.S.A § 2453a(c) (courts "shall be guided by the construction of federal antitrust law and the Sherman Act"). |
| **Virginia**<br><br>Consumer IPP Compl.: Count 50, ¶¶ 792–803(Cons. Prot.) | • *Robinson*, 2025 WL 2802077, at *16; *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d at 847. |

| | |
|---|---|
| **West Virginia**<br><br>Commercial IPP Compl.: ¶ 450 (Antitrust); ¶ 469 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 51, ¶¶ 804–10 (Antitrust) | • W. Va. Code § 47-18-16 ("This article shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes.").<br>• *Kessel v. Monongalia Cnty. Gen. Hosp. Co.*, 648 S.E.2d 366, 379–81 (W. Va. 2007) ("[W]e find no reason to depart from federal precedent when analyzing the viability of Appellants' claims."). |
| **Wisconsin**<br><br>Commercial IPP Compl.: ¶ 451 (Antitrust)<br><br>Consumer IPP Compl.: Count 52, ¶¶ 811–15 (Antitrust) | • *Fox Valley Thoracic Surgical Assocs., S.C. v. Ferrante*, 747 N.W.2d 527, 527 (Wis. App. 2008) ("Wisconsin courts often look to federal courts for guidance.") (citation modified). |

**Appendix C**

**Sec II.B.1: Consumer Protection Laws of Certain States Do Not Apply to Antitrust-Type Conduct.**

| State | Supporting Caselaw |
|---|---|
| **Arkansas**<br><br>Commercial IPP Compl.: ¶ 456 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 3, ¶¶ 458--67 (Cons. Prot.) | • *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1166–67 (N.D. Cal. 2015) ("[T]he ATPA does not extend to the monopoly and price inflation claims at issue here."). |
| **Colorado**<br><br>Consumer IPP Compl.: Count 7, ¶¶ 498–505 (Cons. Prot.) | • *In re Crop Protection Prods. Loyalty Prog. Antitrust Litig.*, 2025 WL 315835, at *24 (M.D.N.C. Jan. 28, 2025) ("The CCPA enumerates an extensive set of 'deceptive acts,' none of which expressly proscribes anticompetitive conduct without reference to deception."). |
| **Florida**<br><br>Commercial IPP Compl.: ¶ 458 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 11, ¶¶ 532–41 (Cons. Prot.) | • *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *19 (N.D. Ill. June 29, 2015) ("The contours of Florida's antitrust laws would be rendered moot were the Court to allow Indirect Plaintiffs to repackage their dead-on-arrival antitrust claims as FDUTPA claims."). |
| **Illinois**<br><br>Commercial IPP Compl.: ¶ 460 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 14, ¶¶ 556–64 (Cons. Prot.) | • *Gaebler v. New Mexico Potash Corp.*, 676 N.E. 2d 228, 230 (Ill. App. 1st Dist., 1996) (no Consumer Fraud Act claim for "classic antitrust allegations dressed in Consumer Fraud Act clothing"). |
| **Michigan**<br><br>Consumer IPP Compl.: Count 21, ¶¶ 600–603) (Cons. Prot.) | • *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1076 (S.D. Cal. 2017) |

| | |
|---|---|
| **Minnesota**<br><br>Commercial IPP Compl.: ¶ 461 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 23, ¶¶ 610–14 (Cons. Prot.) | • *In re New Motor Vehicle Can. Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 190 (D. Me. 2004) (Minnesota Uniform Deceptive Trade Practices Act does not cover parallel action claims). |
| **Nevada**<br><br>Commercial IPP Compl.: ¶ 463 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 30, ¶¶<br><br>644–55 (Cons. Prot.) | • *Sheet Metal Workers Local 441 Health & Welfare Plan v. Glaxosmithkline, PLC*, 737 F. Supp. 2d 380, 417 (E.D. Pa. 2010) (dismissing Nevada claims based on conduct not enumerated in Section 598.0915). |
| **New Jersey**<br><br>Consumer IPP Compl.: Count 34, ¶¶ 677–80 (Cons. Prot.) | • *Wilson v. Gen. Motors Corp.*, 190 N.J. 336, 339, 341 (2007) |
| **New Mexico**<br><br>Commercial IPP Compl.: ¶ 464 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 36, ¶¶ 687–97 (Cons. Prot.) | • *In re Graphics Processing Units Antitrust Litig.* 527 F. Supp. 2d 1011, 1029–30 (N.D. Cal. 2007) (price fixing not prohibited under NMUPA, N.M. Stat. Ann. § 57-12-2(D)). |
| **Oregon**<br><br>Consumer IPP Compl.: Count 41, ¶¶ 729–39 (Cons. Prot.) | • *In re Dynamic Random Access Memory (Dram) Antitrust Litig.* 516 F. Supp. 2d 1072, 1115 (N.D. Cal. 2007) (Oregon's enumerated unlawful practices do not cover "antitrust price-fixing").<br>• *In re Graphics Processing Units Antitrust Litig.* 527 F. Supp. 2d 1011, 1029–30 (N.D. Cal. 2007) ("Oregon's Unfair Trade Practices Act lists a number of practices proscribed by the statute; price fixing is not among them.") (citation modified). |
| **Rhode Island**<br><br>Commercial IPP Compl.: ¶ 466 (Cons. Prot.) | • *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1161 (N.D. Cal. 2009) ("The Court concurs… that price fixing is not within the ambit of [Rhode Island's] UTPCPA.").<br>• *In re Graphics Processing Units Antitrust Litig.* 527 F. Supp. 2d 1011, 1029–30 (N.D. Cal. 2007) (Clobetasol 2017-10-07). |

| | |
|---|---|
| Consumer IPP Compl.: Count 44, ¶¶ 751–56 (Cons. Prot.) | • *In re Dynamic Random Access Memory (Dram) Antitrust Litig.* 516 F. Supp. 2d 1072, 1116 (N.D. Cal. 2007) (price-fixing allegations fall outside UTPCPA's enumerated conduct). |
| **South Carolina**<br><br>Commercial IPP Compl.:<br><br>¶ 467 (Cons. Prot.) | • *In re Aggrenox*, 2016 WL 4204478, at *9 (South Carolina consumer protection law cannot act as a surrogate for antitrust law). |
| **South Dakota**<br><br>Consumer IPP Compl.: Count 46, ¶¶ 763–73 (Cons. Prot.) | • *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, Case No. 19-md-02918-MMC, 2021 WL 4306018, at *19 (N.D. Cal. Sept. 22, 2021) (plaintiffs cannot base their South Dakota Deceptive Trade Practices and Consumer Protection Act claim on price-fixing allegations). |
| **West Virginia**<br><br>Commercial IPP Compl.: ¶ 469 (Cons. Prot.) | • *In re Dynamic Random Access Memory (Dram) Antitrust Litig.* 516 F. Supp. 2d 1072, 1118 (N.D. Cal. 2007) (antitrust violations are not among the West Virginia statute's enumerated practices). |

**Appendix D**

**Sec. II.B.2: IPPs Fail to Satisfy Pre-Complaint Notice Requirements of Several States.**

| State | Notice Provision |
|---|---|
| **Arizona**<br><br><u>Commercial IPP Compl.</u>: ¶ 420 (Antitrust)<br><br><u>Consumer IPP Compl.</u>: Count 2, ¶¶ 452–57 (Antitrust) | • Ariz. Rev. Stat. Ann. § 44-1415(A) (Uniform State Antitrust Act) ("A person filing a complaint, counterclaim or answer for any violation of the provisions of this article shall simultaneously with the filing of the pleading in the superior court or, in the case of pendent state law claims in the federal court, serve a copy of the complaint, counterclaim or answer on the attorney general. Proof of service on the attorney general shall be filed with the court.").<br>• *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *14-15 (D. Mass. July 20, 2016) |
| **Colorado**<br><br><u>Commercial IPP Compl.</u>: ¶ 422 (Antitrust)<br><br><u>Consumer IPP Compl.</u>: Count 6, ¶¶ 490–97 (Antitrust); Count 7, ¶¶ 498–505 (Cons. Prot.) | • Colo. Rev. Stat. Ann. § 6-4-116 (Colorado State Antitrust Act of 2023) (complaint must be served on the attorney general "simultaneously with the filing of the action"). |
| **Connecticut**<br><br><u>Commercial IPP Compl.</u>: ¶ 423 (Antitrust)<br><br><u>Consumer IPP Compl.</u>: Count 8, ¶¶ 506–14 (Antitrust and Cons. Prot.) | • Conn. Gen. Stat. Ann. § 35-37 (Connecticut Antitrust Act) (complaint must be mailed to the Attorney General "simultaneously with the returning of the same to Superior Court" or federal court).<br>• Conn. Gen. Stat. Ann. § 42-110g (Connecticut Unfair Trade Practices Act) (plaintiff must mail the complaint, and any judgment, to the Attorney General and the Commissioner of Consumer Protection). |
| **Hawaii**<br><br><u>Commercial IPP Compl.</u>: ¶ 426 (Antitrust); ¶ 459 (Cons. Prot.) | • Haw. Rev. Stat. Ann. §§ 480-13.3(a), (a)(1), (a)(5)(C) (Hawaii Antitrust Law) ("A class action for claims for a violation of this chapter . . . may be filed, and may be prosecuted . . . by a person other than the attorney general . . . [so long as a] filed copy of the complaint . . . [is] served on the attorney general . . . [and] the State declines or fails to timely elect to proceed with the action."). |

| | |
|---|---|
| Consumer IPP Compl.: Count 12, ¶¶ 542–47 (Antitrust) | |
| **Nevada**<br><br>Commercial IPP Compl.: ¶ 436 (Antitrust); ¶ 463 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 29, ¶¶ 644–49 (Antitrust); Count 30, ¶¶<br><br>644–55 (Cons. Prot.) | • Nev. Rev. Stat. Ann. § 598A.210(3) (Nevada Unfair Trade Practices Act) ("Any person commencing an action for any violation of the provisions of this chapter shall, simultaneously with the filing of the complaint with the court, mail a copy of the complaint to the Attorney General.")<br>• *In re Effexor Antitrust Litig.*, 337 F. Supp. 3d 435, 457–58 (D.N.J. 2018) (barring Nevada consumer protection claim due to statutory notice provision) |
| **New York**<br><br>Commercial IPP Compl.: ¶ 440 (Antitrust)<br><br>Consumer IPP Compl.: Count 37, ¶¶ 698–702 (Antitrust) | • N.Y. Gen. Bus. Law § 340(5) (The Donnelly Act) ("At or before the commencement of any civil action by a party other than the attorney-general for a violation of this section, notice thereof shall be served upon the attorney-general. Where the aggrieved party is a political subdivision or public authority of the state, notice of intention to commence an action under this section must be served upon the attorney-general at least ten days prior to the commencement of such action."). |
| **Rhode Island**<br><br>Commercial IPP Compl.: ¶ 445 (Antitrust); ¶ 466 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 43, ¶¶ 745–50 (Antitrust); Count 44, ¶¶ 751–56 (Cons. Prot.) | • 6 R.I. Gen. Laws Ann. § 6-36-21 (Rhode Island Antitrust Law) ("Upon commencement of any civil action by a person, other than the attorney general, for a violation of this chapter, the plaintiff shall mail a copy of the complaint to the attorney general and shall file proof of service on the attorney general with the court. The civil action may not proceed until the proof of service is filed."). |
| **Utah**<br><br>Commercial IPP Compl.: ¶ 448 (Antitrust) | • Utah Code Ann. § 76-10-3109(9) (Utah Antitrust Act) ("The attorney general shall be notified by the plaintiff about the filing of any class action involving antitrust violations that includes plaintiffs from this state."). |

| | |
|---|---|
| Consumer IPP Compl.: Count 48, ¶ 780–85 (Antitrust) | |

**Appendix E**

**Sec. II.B.4: Certain Consumer Protection Statutes Do Not Allow Claims Based on Commercial Transactions.**

| **State** | **Supporting Caselaw** |
|---|---|
| **Hawaii**<br><br>Commercial IPP Compl.: ¶ 459 (Cons. Prot.) | • Haw. Rev. Stat. Ann. § 480-1 ("No person other than a consumer, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this action.").<br>• Haw. Rev. Stat. Ann. § 480-2(d) (""Consumer" means a natural person" who purchases "primarily for personal, family, or household purposes").<br>• *Ozaki v. Saunders*, 403 P.3d 307 (Table) (Ct. App. 2017) (UDAP claims limited to natural persons purchasing primarily for personal, family, or household purposes). |
| **Minnesota**<br>Commercial IPP Compl.: ¶ 461 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 23, ¶¶ 610–14 (Cons. Prot.) | • *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5227130, at *3 (N.D. Ill. Aug. 15, 2023) (Minnesota, South Carolina, and Vermont statutes "apply only to 'consumer' transactions"). |
| **Nevada**<br>Commercial IPP Compl.: ¶ 463 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 30, ¶¶<br><br>644–55 (Cons. Prot.) | • *See* Nev. Rev. Stat. Ann. § 598.0923(2)(b) ("'Unconscionable practice' means an act or practice which, to the detriment of a consumer… [results in one of the enumerated outcomes]."). <br>• Nev. Rev. Stat. §598.170 ("'Consumer goods or services' are goods or services purchased, leased or rented primarily for personal, family or household purposes…").<br>• *In re Cast Iron Soil Pipe and Fittings Antitrust Litig.*, 2015 WL 5166014, at *3 (E.D. Tenn. 2015) (NDTPA permits "only natural persons to bring claims"). |
| **Rhode Island**<br>Commercial IPP Compl.: ¶ 466 (Cons. Prot.)<br><br>Consumer IPP Compl.: Count 44, ¶¶ 751–56 (Cons. Prot.) | • R.I. Gen. Laws. § 6-13.1-5.2(a) ("Any person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property… may bring an action… to recover actual damages…").<br>• *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 423 (E.D. Pa. 2010). |
| **South Carolina**<br>Commercial IPP Compl.: | • *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5227130, at *3 (N.D. Ill. Aug. 15, 2023) (Minnesota, South Carolina, and Vermont statutes "apply only to 'consumer' transactions"). |

| | |
|---|---|
| ¶ 467 (Cons. Prot.) | |
| **Vermont**<br><u>Commercial IPP Compl.</u>: ¶ 468 (Cons. Prot.)<br><br><u>Consumer IPP Compl.</u>: Count 49, ¶¶ 786–91 (Cons. Prot.) | • *In re Broiler Chicken Antitrust Litig.*, 2023 WL 5227130, at *3 (N.D. Ill. Aug. 15, 2023) (Minnesota, South Carolina, and Vermont statutes "apply only to 'consumer' transactions"). |
| **West Virginia**<br><u>Commercial IPP Compl.</u>: ¶ 469 (Cons. Prot.) | • W .Va. Code §46A-6-102(2) ("'Consumer' means a natural person to whom a sale or lease is made in a consumer transaction and a 'consumer transaction' means a sale or lease to a natural person or persons for a personal, family, household or agricultural purpose."). |

**Appendix F**

**Sec. II.C.3: Some States Bar Commercial IPPs' Unjust Enrichment Claims Where an Adequate Legal Remedy Exists.**

| State | Supporting Caselaw |
|---|---|
| **Arizona** | • *Trustmark Ins. Co. v. Bank One, Ariz, NA*, 48 P.3d 485, 491 (Ariz. Ct. App. 2002) (plaintiffs must show the absence of a legal remedy to succeed on an unjust enrichment claim). |
| **California** | • *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 849 (N.D. Ill. 2020), *aff'd sub nom. Mayor & City Council of Baltimore v. AbbVie Inc.*, 42 F.4th 709 (7th Cir. 2022) ("As AbbVie points out, California law does not recognize an independent cause of action for unjust enrichment.") (citation modified). |
| **Massachusetts** | • *Taylor Woodrow Blitman Const. Corp. v. Southfield Gardens Co.*, 534 F. Supp. 340, 347 (D. Mass. 1982) ("Where plaintiff has an adequate remedy at law, equity will not consider a claim for unjust enrichment."). |
| **Minnesota** | • *Southtown Plumbing, Inc. v. HarNed Lumber Co., Inc.*, 493 N.W.2d 137, 140 (Minn. 1992) ("It is well settled in Minnesota that one may not seek a remedy in equity when there is an adequate remedy at law").<br>• *Kelley v. Coll. of St. Benedict*, 901 F. Supp. 2d 1123, 1132–33 (D. Minn. 2012) (dismissing claim for unjust enrichment because an adequate legal remedy was available). |
| **Montana** | • *N. Cheyenne Tribe v. Roman Catholic Church ex rel. Dioceses of Great Falls/Billings*, 296 P.3d 450, 458 (Mont. 2013) (unjust enrichment "should be limited to situations in which no other remedy exists"). |
| **New Hampshire** | • *E. Elec. Corp. v. FERD Const., Inc.*, 2005 WL 3447957, at *2–3 (D.N.H. Dec. 15, 2005) ("Equitable remedies are not available in New Hampshire courts when the plaintiff has an adequate legal remedy.").<br>• *Parsons Infrastructure & Tech. Grp., Inc. v. Gilbane Bldg. Co.*, 2005 WL 2978901, at *1 (D.N.H. Nov. 7, 2005) (no unjust enrichment where adequate legal remedy exists). |
| **South Dakota** | • *Rindy v. Schler*, 2003 S.D. 24, ¶ 12 ("An essential element to equitable relief" in South Dakota "is the lack of an adequate remedy at law."). |
| **Tennessee** | • *Furlough v. Spherion Atl. Workforce, LLC*, 397 S.W.3d 114, 134 (Tenn. 2013) (holding that equitable relief is unavailable unless plaintiff can show "there is no other available or adequate remedy"). |
| **Utah** | • *Am. Towers Owners Ass'n Inc. v. CCI Mech. Inc.*, 930 P.2d 1182, 1193 (Utah 1996) (stating unjust enrichment is not available under Utah law if "a legal remedy is available" for the alleged misconduct). |

**Appendix G**

**Sec. II.C.4: Commercial IPPs' Unjust Enrichment Claims Also Fail State-Specific Pleading Standards.**

| State | Supporting Caselaw |
|---|---|
| **Arizona** | • *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz App. 1st Div. 2011) (unjust enrichment requires "the absence of a remedy provided by law"; contribution remedy barred claim in part). |
| **Florida** | • *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017) (For "an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant."). <br> • *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 1:15-cv-6549, 2021 WL 2403727, at *36 (S.D.N.Y. June 11, 2021) (applying Florida law) (indirect purchasers cannot bring Florida unjust enrichment claims). |
| **Iowa** | • *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192, 199–200 (Iowa 2007) (no unjust enrichment recovery absent a direct benefit; injuries too remote). |
| **Maine** | • *Howard & Bowie, P.A. v. Collins*, 759 A.2d 707, 710 (Me. 2000) (unjust enrichment under Maine law requires plaintiff to prove first "that it conferred a benefit on the other party…"). |
| **Massachusetts** | • *Mcr Labs, LLC v. Analytics Labs, LLC*, 2025 WL 3095002 at *9 (Mass. Super. Oct. 21, 2025) (dismissing Massachusetts unjust enrichment claims because plaintiff did not "confer[] a benefit on Defendants."). |
| **Michigan** | • *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 271 (S.D.N.Y. 2019) (no Michigan unjust enrichment claim by indirect purchasers absent direct benefit to defendant). |
| **Missouri** | • *Flynn v. FCA US LLC*, 327 F.R.D. 206, 221 (S.D. Ill. 2018) (unjust enrichment under Missouri law requires plaintiff to first prove that it conferred a benefit on the defendant). |
| **North Carolina** | • *Effler v. Pyles*, 380 S.E. 2d 149, 152 (N.C. App. 1989) (plaintiff failed to show "she conferred a benefit on defendant"). |
| **North Dakota** | • *Thimjon Farms P'ship v. First Int'l Bank & Tr.*, 837 N.W.2d 327, 336 (N.D. 2013) (affirming dismissal of unjust enrichment claim where Defendant "received no benefit directly from" plaintiff). |
| **Rhode Island** | • *Sousa v. Roy*, 243 A.3d 775, 782 (R.I. 2021) (no evidence plaintiffs "conferred any kind of benefit upon the defendant"). |
| **Utah** | • *Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000, 1018 (Utah 2015) ("A defendant is liable under the unjust enrichment prong of quantum meruit only if he or she received a direct benefit from the plaintiff."). |

| | |
|---|---|
| **West Virginia** | • *Hill v. Stowers*, 680 S.E. 2d 66, 75 (W.Va. 2009) (no unjust enrichment where "plaintiff was not the payor"); *see also Emp. Teamsters-Loc. Nos. 175/505 Health & Welfare Tr. Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463, 471 (S.D.W.Va. 2013) (first element is "a benefit conferred upon the [defendant]"). |
| **Wisconsin** | • *Loeb v. Champion Petfoods USA Inc.*, 359 F. Supp. 3d 597, 605 (E.D. Wis. 2019) (benefit must be conferred by plaintiff on defendant). |